**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WONDER STATE MANUFACTURING COMPANY, Respondent.**

No. 17828.

United States Court of Appeals Eighth Circuit.

April 20, 1965.

William Wachter, Atty., N. L. R. B., for petitioner. Arnold Ordman, Gen. Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B. and Warren M. Davison, Atty., N. L. R. B., Washington, D. C., on the brief.

Alan I. Berger, St. Louis, Mo., for respondent. V. Lee McMahon of McMahon & Zempel, St. Louis, Mo., on the brief.

Before VAN OOSTERHOUT and MATTHES, Circuit Judges, and YOUNG, District Judge.

MATTHES, Circuit Judge.

This case is here on the petition of the National Labor Relations Board pursuant to § 10(e) (29 U.S.C.A. § 160(e)) of the National Labor Relations Act, as amended, for enforcement of its order against Wonder State Manufacturing Company, respondent. The Board's Decision and Order are reported at 147 N. L.R.B. No. 23 (1964).

The Board found that respondent had violated § 8(a) (5) and (1) of the Act (29 U.S.C.A. § 158(a) (5) and (1), by unilaterally discontinuing payment of the customary Christmas bonus in 1962; and by unilaterally adjusting labor grades and job classifications to grant wage increases to a substantial number of employees on May 17, 1963. The Board also found respondent had violated § 8(a) (5) and (1) of the Act by refusing to bargain in good faith with re-

spect to a contract covering the employees.[1]

The Board entered a cease and desist order in accordance with the recommendations of the trial examiner's recommended order with one modification. The examiner had recommended that respondent be ordered and required to make whole eligible employees for any loss they may have suffered because of the termination of the 1962 Christmas bonus. The Board found that because respondent was facing serious financial losses in December, 1962, the examiner's recommendation in this regard should be deleted.

No serious factual dispute is indicated by the briefs of the parties and a brief résumé of the uncontradicted facts will suffice as an introduction to the contentions of the parties and the legal issues involved.

Respondent, an Arkansas corporation, having its office and plant in Paragould, Arkansas, is engaged in the fabrication and sale of cotton gin equipment and supplies.

Pursuant to an election on August 30, 1962, the International Association of Machinists, AFL–CIO, was certified as the exclusive collective bargaining agent of respondent's production and maintenance employees. On January 28, 1963, pursuant to motion of the International, certification issued to it was amended by substituting the name of Lodge 1568, International Association of Machinists, AFL–CIO.[2]

Pursuant to a request from a representative of the International, respondent, on September 12, 1962, furnished International with information concerning its employee merit grading system, rates of pay, vacations, and other pertinent information relating to fringe bene-

fits, but no reference was made in this letter in regard to respondent's Christmas bonus policy. In 1959, 1960 and 1961 respondent paid its employees a bonus but failed to do so in December, 1962.

Collective bargaining between International and respondent began on September 26, 1962. Numerous bargaining meetings were held between that date and March 1, 1963, but the parties were unsuccessful in negotiating and agreeing upon a satisfactory contract. Shortly after the bargaining negotiations broke off on March 1, respondent unilaterally put into effect wage increases, based on a merit evaluation, for a number of its employees.

Union filed charges on May 21, 1963, and an amendment thereto on June 13 on the basis of which the general counsel filed its complaint.

The questions for decision are: (1) did respondent violate § 8(a) (5) and (1) by unilaterally discontinuing the Christmas bonus in 1962; (2) did respondent violate § 8(a) (5) and (1) by unilaterally granting wage increases after negotiations for a contract had reached a stalemate; (3) does the totality of respondent's conduct support the Board's finding that it failed to bargain in good faith toward a collective bargaining ageement? We enforce the 8(a) (5) and (1) violation relating to issue (2), but deny enforcement as to issues (1) and (3).

■ *Christmas bonus issue.* The initial question in regard to this issue is whether the Christmas bonuses previously paid by respondent were within the meaning of wages as that term is used in § 9(a) of the Act (29 U.S.C.A. § 159(a)), so that this was a matter upon which respondent was bound by law to bargain if

---

1. § 8(a): "It shall be an unfair labor practice for an employer—
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 U.S. C.A. § 157] of this title;
 "(5) to refuse to bargain collectively with the representatives of his em-

ployees, subject to the provisions of section 9(a) of this title." [29 U.S.C.A. § 159(a)].

2. Hereinafter we will refer to the International Association of Machinists and Lodge 1568 collectively as "Union."

requested.[3] The rule is that gifts per se—payments which do not constitute compensation for services—are not terms and conditions of employment, and an employer can make or decline to make such payments as he pleases, but if the gifts or bonuses are so tied to the remuneration which employees received for their work that they were in fact a part of it, they are in reality wages and within the statute. This is a question of fact and, if the Board's finding to that effect is supported by substantial evidence, the finding must be accepted on review. National Labor Relations Bd. v. Niles-Bement-Pond Company, 199 F.2d 713 (2 Cir. 1952); N. L. R. B. v. Electric Steam Radiator Corporation, 321 F.2d 733 (6 Cir. 1963); N. L. R. B. v. Citizens Hotel Company, 326 F.2d 501 (5 Cir. 1964); N. L. R. B. v. United States Air Conditioning Corporation, 336 F.2d 275 (6 Cir. 1964); N. L. R. B. v. Toffenetti Restaurant Company, 311 F.2d 219 (2 Cir. 1962); National Labor Relations Board v. Wheeling Pipe Line, 229 F.2d 391 (8 Cir. 1956). The Board adopted the examiner's finding that "a monetary Christmas bonus has been a part of respondent's wage plan or fringe benefits to employees dating back to the year of 1955." We do not regard the evidence as supporting this finding. The record reveals that respondent embarked upon its operations in 1950. Apparently bonuses were not paid until 1955. In that year and in 1956 respondent gave to its employees cash amounts as follows: 15 employees received $10 each, one received $15, 5 received $20 each, and 3 received $25 each; in 1956, 25 employees received $10 each, 5 received $20 each, and 3 received $25 each. Because of a crop failure in 1957 which was reflected in respondent's business no bonuses were made in that year. Likewise, in 1958 there were no bonuses, but the reason does not appear. In 1959, the employees received a cash bonus equal to one week's wages, in 1960 one-half week's wages, in 1961 one week's wages and, as stated, none in 1962.[4]

The record establishes conclusively that on November 16, 1962, with one exception, the entire executive staff of respondent, the foreman of the machine shop, and some salesmen resigned and organized a new competing corporation. This precipitated a "terrific price competition" and seriously affected respondent's financial situation. The record shows that because of this economic development respondent decided against giving a bonus in 1962.[5] In our view, this circumstance was consistent with the testimony of the vice-president of respondent that the Christmas bonus was based upon the previous 3 months' business, the economic outlook and the general Christmas spirit that prevails at the time, and that the bonus was not earned, rather it was a gift or gratuity. There was also testimony from at least one of the former employees of respondent to the effect that he considered the amount received at Christmas as a gift.

3. § 9: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment * * *."

4. The examiner found that in addition to the cash bonuses "the respondent on several occasions presented hams or turkeys as a Christmas gift to its employees."

5. The Board was cognizant of this situation and found "that in December 1962 the Respondent was facing serious losses brought about by sharp price reductions to meet the competition of a rival company which was organized in November with a staff recruited in part from the Respondent's key personnel and work force. * * * As it appears that the Respondent in any event would have omitted the Christmas bonus in December 1962 because of the serious decline in business and sharply decreasing earnings resulting from the emergence of a rival company we are of the opinion that it would not effectuate the policies of the Act to require the Respondent to pay a 1962 bonus."

Thus, from the uncontroverted evidence, the following facts plainly appear: (1) there was no consistency or regularity in awarding the bonuses—rather they were made intermittently, i. e., in three of the five years immediately prior to 1962; (2) there was no uniformity in or basis for the amount of the bonus; (3) the bonuses were not tied to the remuneration received by the employees; (4) whether a bonus was paid and the amount thereof depended on the financial condition and ability of respondent.

In the cases cited, supra, the bonuses were of regular and long duration (10 to 19 years) and in most instances the bonus was tied into seniority. Because of these and other circumstances not present here, the Board and courts had little difficulty in deciding that the bonuses were in fact wages or remuneration within the statute.

■ We conclude that the Board's finding in regard to the Christmas bonus issue is not supported by substantial evidence on the record considered as a whole. The evidence compels the holding that the bonuses were gifts and, being so, respondent was under no obligation to bargain with International prior to discontinuance of the bonus in 1962.

*Unilateral wage increases issue.* Shortly after the March 1, 1963 meeting, respondent, acting upon advice of its attorney, caused its plant manager to re-evaluate all the employees and recommend reclassification and wage increases. Of the 42 employees in the bargaining unit 9 were reclassified and given wage increases ranging from a minimum of 10 cents per hour to a maximum of 30 cents per hour.

The Board adopted the examiner's finding "that by unilaterally adjusting the job classifications of certain employees on May 17, 1963, in order to grant them wage increases without formally negotiating with their certified bargaining representative, the Respondent refused to bargain collectively with the representative of its employees, subject to the provisions of Section 9(a), within the meaning of Section 8(a) (5) of the Act."

The law applicable to this issue is clearly enunciated in National Labor Relations Board v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). In *Katz* unilateral merit increases were granted in October, 1956 and January, 1957, both prior to the final bargaining meeting on May 13, 1957. The Board found this constituted a violation of § 8(a) (5) of the Act. In affirming the Board, the Supreme Court stated, pp. 745, 746, 747, 82 S.Ct. pp. 1113, 1114:

"The matter of merit increases had been raised at three of the conferences during 1956 but no final understanding had been reached. In January 1957, the company, without notice to the union, granted merit increases to 20 employees out of the approximately 50 in the unit, the increases ranging between $2 and $10. This action too must be viewed as tantamount to an outright refusal to negotiate on that subject, and therefore as a violation of § 8(a) (5), unless the fact that the January raises were in line with the company's long-standing practice of granting quarterly or semiannual merit reviews—in effect, were a mere continuation of the status quo—differentiates them from the wage increases and the changes in the sick-leave plan. We do not think it does. Whatever might be the case as to so-called 'merit raises' which are in fact simply automatic increases to which the employer has already committed himself, the raises here in question were in no sense automatic, but were informed by a large measure of discretion.

\* \* \* \* \* \*

"Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy. It will often disclose an unwillingness to agree with the union. It will rarely be justified by

any reason of substance. It follows that the Board may hold such unilateral action to be an unfair labor practice in violation of § 8(a) (5), without also finding the employer guilty of over-all subjective bad faith."

■ Here, respondent attempts to justify the wage increases on two grounds: (1) that it negotiated with Union in regard to the matter, and (2) that the increases were in accordance with a plan that had been in existence since January, 1961. As to contention (1), we believe the record as a whole fully supports the Board's finding that respondent and the Union did not bargain on the subject of the merit wage increases and that respondent acted unilaterally in taking such action. It is true that the vice-president of respondent conferred with one of the representatives of the local labor organization and informed him of the contemplated increases. It is not surprising that this representative agreed to the plan because he was included therein and received an increase of 15 cents per hour. The record demonstrates, however, that the major portion of the negotiations in behalf of the bargaining representative had been carried on by one of the International's representatives and it stands undisputed that this representative was not consulted by respondent in regard to the wage increases and knew nothing about them until after they were put into effect.

■ The second contention must also fail. As in *Katz*, under respondent's wage plan (appearing in the trial examiner's decision reported at 147 N.L.R.B. No. 23) the wage raises were in no sense automatic but "were informed by a large measure of discretion."

■ In summary, we are satisfied that there is substantial evidence to support the Board's finding that respondent acted unilaterally in granting wage increases without formally negotiating with the bargaining representative, and that it thereby violated § 8(a) (5) of the Act.

■ *Failure to bargain in good faith issue.* Under the Act, the employer and the representative of the employees are mutually obligated to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession." § 8(d), 29 U.S.C.A. § 158(d). In considering § 8(d), the Supreme Court in National Labor Relations Board v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L. Ed. 1027 (1952), stated:

"That Section contains the express provision that the obligation to bargain collectively does not compel either party to agree to a proposal or require the making of a concession.

"Thus it is now apparent from the statute itself that the Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position. And it is equally clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements."

Compare also National Labor Relations Board v. Wooster Division of Borg-Warner Corporation, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

■ The employer is under a duty to enter into sincere, good faith negotiations with the constituted representative of the employees, with an intent to settle the differences and to arrive at an agreement. Mere pretense at negotiation with a completely closed mind and without this spirit of cooperation and good faith does not satisfy the requirements of the Act. National Labor Relations Board v. Shannon, 208 F.2d 545, 548 (9 Cir. 1953). The parties are required to deal with each other with an open and fair mind and sincerely endeavor to overcome obstacles or differences existing between them to the end that employment

relations may be stabilized and obstruction to the free flow of commerce prevented. National Labor Relations Board v. Montgomery Ward & Co., 133 F.2d 676, 684, 686, 146 A.L.R. 1045 (9 Cir. 1943). See also N.L.R.B. v. W. R. Hall, Distributor, 341 F.2d 359, 362 (10 Cir. 1965), where the Court stated:

"Delay, its cause and effect, cooperation between the parties or its lack, preparation for discussion or its lack, and the reasonableness or unreasonableness of demands are among those factors which the fact finder can consider in the difficult task of laying bare the subjective intent of the parties."

 On this issue the Board emphasizes that the totality of respondent's conduct subsequent to the time of the certification of International, discloses a lack of good faith in bargaining toward a collective-bargaining agreement. We are not so persuaded. The granting of the wage increases, which violated § 8(a)(5), when viewed in light of the attending facts and circumstances, does not per se constitute substantial evidence of bad faith bargaining. National Labor Relations Board v. Katz, supra, teaches that an employer may violate § 8(a) (5) by granting unilateral wage increases even in the absence of a finding of overall subjective bad faith.

The Board pinpoints the attitude of respondent in regard to the economic features of the contract and in particular the wage and contract duration proposals. The argument is advanced that the refusal of respondent to grant realistic concessions as to these aspects is evidence that it was motivated by lack of good faith in the bargaining sessions. On this score the evidence reveals that following certification of the International on September 10, 1962, the parties conferred for the first time on September 26. Two sessions were held in November and two in December. On January 16, 1963, the parties concluded agreement on most non-economic issues. At about that time Union submitted an economic proposal, the terms and conditions of which are not revealed by the record. Respondent then submitted a counter-proposal for a five-year contract with a wage increase of 2 cents per hour 18 months after effective date of contract; 3 cents per hour after 36 months, and 3 cents per hour after 54 months. The employees approved the non-economic proposal but rejected the wage and duration aspects of the economic proposal. On January 30 at a bargaining session, the Union submitted a counter-proposal for a two-year contract and wage increases substantially in excess of those proposed by respondent. Under date of February 7 respondent's negotiator, by letter, advised International:

"As I told you there would be no problem on adding the no lock-out provision if everything else is agreed to. It is conceivable that the Company would look more favorably upon the check-off if we could get together on the duration of a contract and the across-the-board increases. Because of our competitive situation the five year contract is as important to us as the money considerations.

"The Company finds it necessary to decline your suggestions on settlement.

"If you find that you can give us the five year contract and across-the-board increases as we suggested, or very closely to those figures, we would be interested in further negotiations with you.

"I do feel however that you should know that your offer or anything in that neighborhood is not acceptable to this Company."

The final meeting of the parties on March 1, 1963 was unproductive.

 From the foregoing résumé and details of the events which transpired, we are impelled to conclude that the Board's finding that respondent did not bargain in good faith is not supported by substantial evidence on the whole record. There is no claim made that respondent in any way sought to postpone

meetings or to stall efforts to reach an agreement. At no time during any of the bargaining sessions was respondent accused of acting in bad faith, and we have some difficulty in comprehending why the bargaining representatives of Union were willing to submit the economic proposal made by respondent to the employees if they sincerely believed, as the Board now contends, that respondent failed to bargain in good faith.

The fact that respondent did not accede to the Union's proposal but endeavored to secure a contract which it regarded would be compatible with its financial condition, does not of itself establish lack of good faith. The Act does not compel either party to agree to a proposal or require the making of a concession. Furthermore, as we have noted, the Board may not directly or indirectly compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements. National Labor Relations Board v. American National Insurance Co., supra; National Labor Relations Board v. Nash-Finch Co., 211 F.2d 622, 627, 45 A.L.R.2d 683 (8 Cir. 1954).

Enforcement of the Board's order is granted in part and denied in part.