NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

HERMAN WILSON LUMBER COMPANY, Respondent.

No. 18022.

United States Court of Appeals Eighth Circuit.

Jan. 31, 1966.

Larson, District Judge, dissented.

tioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Julius Rosenbaum, Atty., N.L.R.B., Washington, D. C., were with him on the brief.

Joseph Alton Jenkins, Dallas, Tex., made argument for respondent; Joseph Alton Jenkins & Associates, Dallas, Tex., and Gaines N. Houston, Little Rock, Ark., were with him on the brief.

Before MATTHES and GIBSON, Circuit Judges, and LARSON, District Judge.

MATTHES, Circuit Judge.

National Labor Relations Board (Board) has petitioned us, pursuant to § 10(e) of the National Labor Relations Act (Act), as amended, for enforcement of its order issued on November 13, 1964, based upon the finding that Herman Wilson Lumber Company (respondent) had violated § 8(a) (1) of the Act (29 U.S. C.A. § 158(a) (1)).[1] The Board's decision and order are reported at 149 N.L. R.B. No. 70.

Respondent, an Arkansas corporation, with its place of business at Monticello, Arkansas, is engaged in the manufacture and sale of lumber and related products. No jurisdictional issue is presented.

The International Woodworkers of America, AFL–CIO (Union), began an organizational campaign at respondent's plant during the summer of 1963. A representation petition was filed on August 12, 1963, and a Board election was scheduled to be held on October 24, 1963.

In the ensuing campaign, respondent attempted to counter Union's drive for representation by distributing handbills to all of its employees. Respondent's president, Herman Wilson, Jr., also delivered three speeches, read from a prepared text, to the employees. The election was held, as scheduled, on October 24, 1963, and the Union lost by a vote of 72 to 31.

Melvin Pollack, Atty., N.L.R.B., Washington, D. C., made argument for peti-

1. Section 8(a) (1) provides that it shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by § 7 of the Act.

Unfair labor charges were filed on November 13 and December 16, 1963. After a hearing, on February 11, 1964, the trial examiner filed his decision, finding, in relevant part, that respondent had violated § 8(a) (1) "[b]y threatening employees with adverse consequences, including job loss, in the event they selected the Union as their collective bargaining agent, and by creating an atmosphere of futility to discourage support for the Union among employees, and by other acts".[2]

After exceptions had been filed by both general counsel and respondent, the Board delegated its powers to a three-member panel. The designated panel, member Leedom dissenting in part, adopted the findings, conclusions and recommendations of the trial examiner.[3]

Basically, the issue is whether the Board properly found that respondent's pre-election statements, contained in the handbills and in Wilson's speeches, were violative of § 8(a) (1) of the Act. Or, as suggested by respondent, "Did Respondent's handbills and speeches contain a threat of reprisal within the meaning of Section 8(c) of the Act" ? (29 U.S. C.A. § 158(c)).[4]

Neither the facts giving rise to this issue, nor the applicable legal principles, are in dispute. The sole bases for the charge that respondent engaged in unfair labor practices are the contents of printed handbills and of written speeches given to respondent's employees by Mr. Wilson, anticipatory to the October 24, 1963, election. These handbills and speeches were offered in evidence at the hearing before the trial examiner. Therefore, resolution of the question before the Board and,

now, before this court, turns strictly upon an interpretation of the effect of the written documents, i. e., whether or not they can be said to have threatened respondent's employees with reprisal or force if the Union had won the election, or, conversely, whether the campaign material is within the protection afforded by § 8(c).

The trial examiner's interpretation, adopted by a majority of the Board, was:

"* * * that in its campaign to defeat the Union, the Respondent on several occasions, as aforestated, stressed and emphasized the fact that if the Union won the election, the Union's only course of action would be to strike, and in which event the Company could permanently replace the strikers. While the Respondent did not state specifically that it would not bargain with the Union should the Union win the election, an analysis of Respondent's entire antiunion campaign reveals an implicit warning that in dealing with the Union the Respondent would so conduct the negotiations that a strike would result. Thus, there was but one theme: the inevitability of a strike if the employees selected the Union as their bargaining representative, and the dire consequences of such a strike, namely, the loss of jobs by the strikers."

On the other hand, member Leedom, in his dissent, concluded that respondent's campaign material

"when considered in context, did not exceed the protection afforded by the Act. So far as pertinent, the Re-

---

2. The examiner found respondent had not discriminatorily discharged one of its employees, in violation of § 8(a) (3), so recommended the dismissal of § 8(a) (3) charges.

3. Member Leedon concurred in the recommended dismissal of the § 8(a) (3) charges but dissented from the finding that respondent had violated § 8(a) (1).

4. Section 8(c) provides:
   "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

spondent stated in its campaign material that it would 'fight the Union in every *legal* way possible'; that it was 'not compelled to agree to a union proposal or to make a concession to the Union'; that it would engage in 'hard bargaining'; that 'the only way a union can *force* your Company to do anything it is *unwilling* to do would be to pull you out on strike'; and that 'if the Union calls an *economic* strike * * * you can be permanently replaced.' Thus, the Respondent did no more, in substance, than tell the employees that Union demands would be resisted by 'hard bargaining'; and that, if the Union resorted to an economic strike to enforce its demands, the Respondent could exercise its lawful right to replace the strikers, and then the strikers would lose their jobs. 'Hard bargaining' is not unlawful conduct under the Act; and the Supreme Court has admonished that the Board may not, 'either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective-bargaining agreements.'" (Emphasis supplied by member Leedom).

The language claimed to be offensive and unprotected, in pertinent part, consisted of the following:

"Herman Wilson [president] does not want a Union in this plant * * and I will fight the Union in every legal way possible. * * * If a Union wins all it wins is the right to bargain—nothing more * * *

"Do you realize that the only way a union can try to force your Company to do anything that it is unwilling to do would be to pull you out on strike. If the Union calls an economic strike you place your job on the line. You can be permanently replaced. You can lose your job.

"An economic strike could cause us to lose business. This might cause us to have to shut down the plant. If so, you would be without a job.

"This Union is going to find me to be the most disagreeable person it ever ran up against. I told you last week I was going to fight this Union in every legal way possible, and I mean it. * * *

"In dealing with the Union I'll deal hard with it—I'll deal cold with it—I'll deal at arm's length with it.

"You know, or if you don't, you should know before you vote that I am not obligated by law to agree to any proposals the Union makes on wages, hours, working conditions, or what have you. If the Union wins the election we will be obliged to negotiate with it, but we are not obligated to agree to any proposals or request that it makes. We are not required to make any concession to it."

■ We agree with the Board that its determination should properly be based upon a consideration of the entire import of the speeches. Daniel Construction Co. v. N. L. R. B., 341 F.2d 805, 811 (4 Cir. 1965), cert. denied, 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (Oct. 11, 1965), (quoting from N. L. R. B. v. Federbush Co., 121 F.2d 954, 957 (2 Cir. 1941)). "[W]hether an employer has employed language which is coercive in its effect is a question essentially for the specialized experience of the NLRB" Ibid., 341 F.2d at p. 811; N. L. R. B. v. Brown-Dunkin Co., 287 F.2d 17, 18 (10 Cir. 1961). However, we are also mindful of the teachings of the Supreme Court in the landmark case of Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490–491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951), that:

"Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. * * * The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of

Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

\* \* \* \* \* \*

" \* \* \* Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals."

In light of the foregoing principles, we have carefully considered the antiunion campaign material, in context, focusing upon the above quoted portions. Beyond peradventure, Wilson, president of the company, demonstrated an aversion to the recognition of any union by respondent's employees. The record leaves us with the distinct impression that the campaign was typified by a sharp conflict of interest, as is often true when a union seeks recognition. As aptly stated in N. L. R. B. v. Colvert Dairy Products Co., 317 F.2d 44, 46 (10 Cir. 1963): "Each [management and union] is accorded the right of persuasion and denied the use of coercion. But it would be unrealistic indeed to expect management to use words of conviction in an effort to persuade an employee to vote against unionization without the presence of 'antiunion animus.' In the matter of the election the management is, of course, antiunion. The union is equally anticompany. It is necessarily so. And hostility toward each other in such regard is not an unfair labor practice."

We deem it unnecessary to deal separately with each of the remarks under scrutiny. They may properly be placed in three categories: (1) an intention, on the part of respondent, to oppose the Union ("I will fight the Union in every legal way possible"); (2) the effect of an economic strike ("If the Union calls an economic strike, you place your job on the line. You can be permanently replaced. You can lose your job"); (3) bargaining with the Union ("In dealing with the Union I'll deal hard with it— I'll deal cold with it—I'll deal at arm's length with it").

■ Clearly, respondent had the right to resort to *lawful* means in seeking to defeat the Union in the election. As a necessary corollary, respondent was privileged to announce that it intended to avail itself of that right.

■ Respondent neither threatened to close its plant nor to take other reprisals against the employees in the event that the Union was successful. Respondent's president did warn of the possible effects of an economic strike. It is fundamental that an economic strike is one over wages, hours, working conditions, or other conditions of employment. But, it is equally well settled that employees who engage in an economic strike may be permanently replaced. N. L. R. B. v. Mackay Co., 304 U.S. 333, 345–347, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). Compare also, N. L. R. B. v. L. G. Everist, Inc., 334 F.2d 312 (8 Cir. 1964). Thus, again, Wilson's accurate forecast of the results that could ensue, if an economic strike were called, was within the pale of the law.

■ Wilson also expressed his intentions regarding the important matter of bargaining with the Union. We think it clear, from the language used, that respondent recognized that, if the Union were successful, it would be required to enter into sincere, good faith negotiations with Union, but would not be compelled to accede to Union demands. N. L. R. B. v. Wonder State Mfg. Co., 344 F.2d 210, 215–216 (8 Cir. 1965). It is also settled that the Board may not, directly or indirectly, compel concessions, or otherwise sit in judgment upon the substantive terms of collective bargaining agreements. N. L. R. B. v. American Natl. Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); N. L. R. B. v. Wonder State Mfg. Co., supra. It should be stressed that respondent did not, in the handbills and speeches, intimate that it would not bargain in good faith with

Union,[5] which was the situation presented by N. L. R. B. v. Little Rock Downtowner, Inc., 341 F.2d 1020 (8 Cir. 1965), and N. L. R. B. v. Brown-Dunkin Co., supra, relied upon by the Board.[6] Indeed, the trial examiner recognized that: "Respondent did not state specifically that it would not bargain with the Union should the Union win the election". However, the examiner then concluded that: "[A]n analysis of Respondent's entire antiunion campaign reveals an implicit warning that in dealing with the Union the Respondent would so conduct the negotiations that a strike would result."

We do not believe that the inference drawn by the examiner was warranted. Neither is it in accord with the Board's decision in Texas Boot Mfg. Co., 143 N.L.R.B. 264 (1963), where the president of the employer read a prepared speech, containing these remarks:

"  *   *   * I don't believe that we can do business with the costs the Union will demand. The only way the Union can enforce its demands on Texas Boot Company is by calling you out on a strike to enforce its unreasonable demands. This is the history of Unions. So I want you to know that I am not going to close down this factory one day, because of a strike called by the Union. We will continue to operate and hire new workers. This simply means that when I employ new people to cross the picket line to work here at Texas Boot that strikers have lost their jobs permanently. I don't think it necessary for me to tell you how many unemployed people there are in Tennessee, Wilson County and Lebanon, who would like to have a job at our plant. We have several hundred applications on file now."

The Board held that the foregoing remarks "when considered in context did not exceed the protection afforded by the Act."

In Texas Industries, Inc., 139 N.L.R.B. 365 (1962), the employer mailed a letter to each of its 200 employees three days before the election, which stated in part:

"  *   *   * There is only one way a union representative can enforce his demands upon the Company. This is by calling a strike. When you strike, you will lose your wages and possibly your job. The Company is free to hire someone to take your place while you are striking and when the strike is over there may not be a job for you.

"  *   *   * You know that under union methods we would not have been able to operate with continuous employment for you during the past year. Good pay checks depend upon continuous full time employment."

There, as here, the Board found that the statements were threats of economic loss, should the Union win the election, and, as such, constituted interference with, restraint and coercion of employees, in violation of § 8(a)(1) of the Act. The Fifth Circuit held that the statements were protected by § 8(c) of the Act and set aside that portion of the Board's order. Texas Industries, Inc. v. N. L. R. B., 336 F.2d 128 (1964). In reversing the Board, the court stated, at p. 130:

"It is well settled that under § 8(c) the employer must be regarded as a rightful contestant for his employees' loyalty in a union election. This section permits an employer to state his legal rights under the Act and to predict that dire economic consequences will follow from a union victory. N. L. R. B. v. Transport Clearings, Inc., 5 Cir., 1963, 311 F.2d 519; Union Carbide Corp. v. N. L. R. B., 6 Cir., 1962, 310 F.2d

---

5. Quite to the contrary, respondent's utterances could only be understood to mean that it would "bargain" or "deal" with the Union, albeit, it would engage in "hard" bargaining.

6. In the *Brown-Dunkin* case, there was testimony that the store supervisors had stated that "management never had dealt with the Union and wouldn't have nothing to do with it."

844. It is only when the employer goes further and threatens to himself take economic or other reprisals against the employees that a § 8(a)(1) violation may be found. Thus, a prediction that competitive conditions will force a plant to close if a union contract is signed is protected, whereas a threat to close down in retaliation to unionization is beyond the pale. N. L. R. B. v. Morris Fishman & Sons, Inc., 3 Cir., 1960, 278 F.2d 792."

In accord with this principle is N. L. R. B. v. Colvert Dairy Products Co., supra.

■ Inasmuch as respondent did not, in any of the handbills or speeches, state anything more than its legal rights, in an entirely legal manner, we are persuaded to hold that the challenged remarks fall within the protection afforded by § 8(c). The conclusion is inescapable that the truthful utterances, protected, as they are, by the First Amendment to the Constitution and authorized by § 8(c), were improperly interpreted by the trial examiner and a majority of the Board as a basis for authorizing an unfavorable inference. Accordingly, enforcement of the Board's order is denied.

LARSON, District Judge (dissenting).

Respectfully, I dissent. In my view, the statements of Respondent's president Wilson should not be granted the protection afforded by Section 8(c) of the Act. In particular, I would find that Wilson's statements suggesting loss of employment following an economic strike were coercive and threatening. The majority categorizes these statements as a "forecast." While Wilson may have been careful to couch his language in terms of prediction, or statement of legal position, in my opinion they could be construed to threaten inevitable loss of jobs following Union certification. When the speeches are totaled up,[1] and considered in context, I think they slipped over the line of permissible argument and expression. The context in which these statements are to be viewed should be more than a literary or grammatical context. They ought to be placed in the light of the type of industry involved, its location, the relative sophistication of the employees, etc. These are among the considerations which should be left to the specialized experience of the Board. In this case, I think it was reasonable for the Board to conclude that the language used had a coercive and intimidating effect.[2]

I am not unmindful of the constitutional dimensions of the question. Of course, employers' views are given the same protection by the First Amendment as the ideas of any other group. Nonetheless, under prevailing constitutional theory, freedom of expression is not an absolute and unqualified right, although some would make it so.[3] Speech may thus be circumscribed where, on the balance of

1. "Even if we assume that each of the key statements in the Daniel speeches considered separately would be lawful (neither the examiner nor the Board made a ruling to this effect), it still does not follow that we must accept the proposition pressed upon us by the company. Daniel may have accurately stated an accepted rule of mathematics, but words and speech are not governed entirely by mechanical mathematical concepts. Words and phrases, each lawful when considered alone, can be united in such a fashion as to yield an improper end product." Daniel Construction Company v. N.L.R.B., 341 F.2d 805 (4th Cir. 1965).

2. "It is often difficult to determine whether certain statements by management constitute permissible forceful argument in support of management's opposition to the advent of a union, or constitute an illegal threat to the employees in the event the union should win the election. In such cases, if the inference or conclusion found by the Board that the statements constituted a threat is a reasonable one, which it was permissible for the Board to make, its conclusion will not be set aside on review, even though a different inference or conclusion may seem more plausible and reasonable to us." (Citations omitted). Surprenant Mfg. Co. v. N.L.R.B., 341 F.2d 756, 760 (6th Cir. 1965).

3. Black, The Bill of Rights, 35 N.Y.U.L. Rev. 882 (1960).

the interests, an over-riding societal purpose demands that expression be regulated.[4] The limitation embodied in the proviso clause of Section 8(c) of the Act should withdraw constitutional immunity from the speech here.

I would enforce the Board's order.

4. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Beauharnais v. People of State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952); Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L. Ed. 1137 (1951).