Walter E. FLACK, Petitioner, Pro Se,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 14186.

United States Court of Appeals Seventh Circuit.

Nov. 7, 1963.

Walter E. Flack, pro se.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Vivian Asplund, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin J. Welles, Attorneys, National Labor Relations Board, Washington, D. C., for respondent.

Before DUFFY and CASTLE, Circuit Judges, and MAJOR, Senior Circuit Judge.

DUFFY, Circuit Judge.

Petitioner, Walter E. Flack, who appeared before us *pro se*, asks this Court to review and set aside an order of the National Labor Relations Board issued on March 6, 1963,[1] dismissing his unfair labor practice complaint against Cushman Motor Delivery Company (Company) and Local 710, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 710). The Intermediate Report of the Trial Examiner was favorable to the claims of the petitioner Flack.

The Regional office of the Board issued a complaint alleging that Local 710 caused the Company to discharge Flack because of his activities on behalf of Rebel Teamsters Union, an organization composed of dissident members of Local 710 and other labor organizations.

The Company employs both City Drivers and Over-the-road Drivers. City drivers are represented by Truck Drivers Independent Union (Independent). The dock hands are represented by Local 710.

Petitioner was employed by the Company as a City Driver and is a member of Independent. He had worked for the Company since 1953, and had been discharged in December 1960 for alleged refusal to make out daily reports.[2] He was reinstated in June 1961 with the assistance of Independent.

In July 1961, Flack became active on behalf of Rebel Teamsters Union in Chicago. Flack distributed Rebel Union literature among both members of the Teamsters and Independent Locals. The purpose of the Rebel movement, according to Flack, was to secure honest administration of existing Teamsters and Independent Unions and to improve grievance procedures.

On September 11, 1961, shortly after Flack had reported for work, Peter Janopoulos, business representative for Local 710, approached him in front of about thirty other company drivers. He swore at Flack, used obscene language, and threatened to break Flack in half. He told Flack that the latter could not pass out literature or talk against Local 710, and threatened him with great personal violence and stated he would run Flack off of any 710 dock that Flack was on.

---

1. 141 N.L.R.B. No. 10.

2. Flack testified he refused to make out the reports because the Company illegally required him to haul goods in over-length and over-loaded trailers, and he didn't wish the reports that would be turned in to the Interstate Commerce Commission to reflect this. After his reinstatement in 1961, Flack did not refuse to make out reports due to an overload. Flack did not receive any warning from the Company in 1961.

After the incident, Flack, received his load and attempted to deliver it. Because the day was a high Jewish Holy Day, the employee who would normally receive the load, was absent from work so Flack had to return the load to the Company. Upon his return, about 10 a. m., Flack asked to be relieved because he was ill. His dispatcher permitted him to take off the balance of the day. Flack testified he was upset by the threats of Janopoulos.

Flack drove his auto to a police station and filed a complaint against Janopoulos. He then visited Burns, President of the Rebel Teamsters Union, and informed him of the events hereinbefore described. Burns contacted several TV stations, and newsreel cameramen were sent to Burns' office where Flack gave a statement before the cameras describing how Janopoulos had threatened him because of his Rebel Teamsters Union activities. Further newsreel shots were taken later in the afternoon. The Company was aware that the newsreels were telecast on Chicago stations that evening.

CLAIRMONT WORK STOPPAGE.

On October 11, 1961, about 1 p. m., Flack arrived at the Clairmont Transfer Company's dock. He proceeded to that part of Clairmont premises where bills of lading are posted. He did so in order to deliver the bill for the consignment he carried and thereby to have his truck unloaded in turn. While going to and from the bill rack, Flack distributed literature of the Rebel Teamsters Union to various employees of Clairmont. He also distributed such literature to various truck drivers as they arrived at the Clairmont dock. Some of the literature referred to James Hoffa as "Little Caesar" and that on an occasion mentioned, Hoffa had told the free press to "Get the Hell out of Here."

The Trial Examiner pointed out that under his Union contract, Flack was entitled to take one hour for lunch at any time between 11 a. m. and 2 p. m., and that Flack arrived at the Clairmont dock

at 1 p. m. It does not appear whether Flack actually ate his lunch there, but while he was sitting in his trailer and shortly after 2 p. m., he was summoned to answer a telephone call from Barney Cushman, President of the Company. Cushman told Flack of complaints he had received, that Flack was interfering with the drivers' work at the dock. Cushman said to Flack that he didn't care about his (Flack's) Union activity, but he was not to distribute literature on company time. Flack retorted that his activities were during his lunch hour and not on company time. Cushman stated he would give Flack a "warning notice."

Flack returned to his truck which had not been unloaded. A few minutes later, three Local 710 organizers arrived. One of them, Bonarigo, told Flack he could not pass out pamphlets. Then Daniel White, Clairmont's manager, told Flack he would not accept his freight. Flack was instructed by his dispatcher to take the freight to another terminal which he did. In talking to Cushman by phone, White asked why the Company permitted its drivers to pass out literature and disturb personnel working on other employers' docks.

THE SCHERER INCIDENT.

On October 13, 1961, Flack arrived with a loaded trailer at the dock of the Scherer Freight Company. One of Scherer's employees helped Flack unload. Flack attempted to convert this employee to the cause of the Rebel Teamsters. William Smith, a steward for Local 710, overheard the solicitation and objected. There was a sharp conflict in the evidence as to what followed. However, the Trial Examiner who had the witnesses before him, believed the Flack version. He stated that Flack impressed him as a man of unusual integrity. According to Flack, Smith entered the trailer and in obscene language, directed him to desist from his "Rebel talk", invited Flack to step outside and threatened to beat him up. Smith struck Flack, knocking him against the

meathook that was hanging on the side of the trailer. Then Smith ordered everybody on the dock to stop work and not to move any freight as long as Flack was there.

Flack went across the street to call the police. Then a sound truck arrived and someone therein through the loud speaker, instructed those on the dock to stop work. Janopoulos and three or four others emerged from the sound truck. Janopoulos approached Flack saying, "You are a dead son-of-a-bitch." and attempted to attack Flack but was held back by others.

After a visit to the police station, Flack called his dispatcher and notified him he could not effect delivery. Whereupon another driver was assigned to and did complete the delivery.

On October 13, President Cushman was drafting a warning notice to Flack based on the Clairmont incident which had occurred two days previously. Before completing the draft, he was told that Flack was concerned in another incident at the Scherer dock. He then decided to convert the warning letter into a discharge letter. This letter set out, among other things, that on one morning Flack reported sick but in the same afternoon was interviewed for a television program. The letter stated that Flack circulated Rebel Teamster literature and application blanks at the Clairmont dock on Company time, and that this created a disturbance. There was also a reference to the incident on October 13 at the Scherer dock.

The Trial Examiner pointed out that Local 710 controlled access to the docks of all common carriers in Chicago and that Cushman was primarily concerned because a complete embargo might be declared against any freight handled by Flack, as long as he carried on his Rebel Teamster activities. The Trial Examiner specifically found, "I find therefore that Flack's discharge stemmed mainly from the opposition of Local 710 to his Rebel Teamster Activities." It was the conclusion of the Trial Examiner that Flack's discharge violated Section 8(a) (3) and (1) of the Act.

It seems clear that if Local 710 had expressly demanded that the Company discharge Flack because of his activities on behalf of Rebel Teamsters, and he had been discharged for that reason, the discharge would have been illegal.

The Trial Examiner found: "While it is true that Local 710 did not in terms demand that Cushman [Company] discharge Flack, I find that it caused discharge as surely as if it had made such a demand; for, Local 710, by the work stoppages, manifested its opposition to Flack's concerted activities in terms which left Cushman [Company] no particular or lawful alternative other than the discharge of Flack."

As to the role of Local 710, the Trial Examiner found: "It has been found that Local 710 instituted the work stoppages and that such stoppages induced Cushman [Company] to discharge Flack. Moreover, it is apparent that Flack's discharge was a foreseeable result of the work stoppages. Under those circumstances, I have no difficulty in finding that Local 710 caused Flack's discharge, thereby violating Section 8(b) (2) and (1) (A) of the Act."

■■ In our view, Flack's activity upon behalf of the Rebel Teamsters Union, although extremely zealous, was a protected, concerted activity under the Act. We hold the Company, by discharging Flack for such activity, violated Section 8(a) (3) and (1) of the Act. We also hold that Local 710, by causing the Company to discharge Flack, violated Section 8(b) (2) and (1) (A) of the Act.

The task of a reviewing court usually is made difficult when the Labor Board seems to entirely disregard the findings and conclusions of a Trial Examiner. To guide us, we turn to the landmark case, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

In Universal, the Court said 340 U.S. at page 491, 71 S.Ct. at page 466, 95 L.

Ed. 456: "Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals."

In discussing the "substantial evidence" standard, the Court, in Universal, stated (340 U.S. at page 496, 71 S.Ct. at page 469, 95 L.Ed. 456): "We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. * * * The significance of his report, of course, depends largely on the importance of credibility in the particular case."

The Court, in Universal, makes a pertinent statement (340 U.S. 495, 71 S.Ct. at page 468, 95 L.Ed. 456): "Nothing in the statutes suggests that the Labor Board should not be influenced by the examiner's opportunity to observe the witnesses he hears and sees and the Board does not. Nothing suggests that reviewing courts should not give to the examiner's report such probative force as it intrinsically commands. * * * Both statutes thus evince a purpose to increase the importance of the role of examiners in the administrative process."

In the same case, the Court states (340 U.S. 493, 71 S.Ct. at page 467, 95 L.Ed. 456): " * * * [T]he plain language of the statutes directs a reviewing court to determine the substantiality of evidence on the record including the examiner's report."

In National Labor Relations Board v. Walton Manufacturing Company, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, the Court quotes another portion of its decision in the Universal case. The Court says, 369 U.S. at page 405, 82 S.Ct. at page 854, 7 L.Ed.2d 829, "We there said [in Universal] that while the 'reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view,' it may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.' "

We are also handicapped in this case due to the fact that petitioner did not have the assistance of an attorney. This has required us to examine with extreme care, every part of the record.

We have concluded that the decision and order of the Labor Board must be reversed. We do not think there is substantial evidence to support the Board's decision and order. In our view, this is not a case where a choice must be made between two fairly conflicting views.

We conceive it to be within the special province of the Board to formulate the order to be entered and the notice to be posted. We suggest, however, that the order suggested by the Trial Examiner would seem to be appropriate.

Reversed.

CASTLE, Circuit Judge (concurring).

I agree with the result reached by my learned colleagues. But I do not agree with the opinion in so far as it appears to imply that Flack's activity in distributing Rebel Teamster's literature during his lunch hour to employees of Clairmont while they were engaged at work was a protected concerted activity under the National Labor Relations Act. In my view Flack's lunch-hour status did not permit him to interrupt the work of Clairmont's employees by his activity on behalf of the Rebel Teamsters, an activity otherwise privileged.