**The WM. H. BLOCK COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 15438.

United States Court of Appeals
Seventh Circuit.

Aug. 22, 1966.

George P. Ryan, William R. Riggs, Indianapolis, Ind., Ice, Miller, Donadio & Ryan, Indianapolis, Ind., of counsel for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert A. Giannasi, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Warren M. Davison, Attorney, N.L.R.B., for respondent.

Before KNOCH, KILEY and SWYGERT, Circuit Judges.

KNOCH, Circuit Judge.

The petitioner, Wm. H. Block Company, filed its petition to review and set aside an Order of the National Labor Relations Board, respondent, and the Board filed its Petition to Enforce that Order.

Two complaints were issued charging the petitioner with violations of § 8(a) (1), (3) and (4)[1] of the National Labor Relations Act, as amended, in the discharge of two employees, Allen Maxwell and Paul Harlan, because of their union activity and because they gave testimony before the Trial Examiner in a hearing on two prior cases.

The two complaints were consolidated for hearing. The Trial Examiner deter-

---

1. Section 8(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7; * * *

(3) by discrmination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; * * *

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act;

mined that neither employee was discharged because of union activity or testimony in the prior hearing but on the contrary had been discharged for cause. He recommended dismissal of the complaints.

On exceptions filed by the General Counsel, the Board found that both employees were discriminatorily discharged and ordered them reinstated and given back pay. The petitioner seeks to review and set aside the Board's Order and the Board seeks to enforce its Order.

The facts are largely undisputed.

The petitioner operates five retail department stores in Indiana. It also has a Service Building at which both these employees worked.

The manager of operations and assistant to the president of the petitioner was Edwin Hinnefeld. He made the decision to discharge the two employees. Until he left the petitioner's employ in February, 1964, Thomas Kimberlin was personnel director. He reported directly to Mr. Hinnefeld. The manager of the Service Building at the pertinent time was Charles Roller who also reported directly to Mr. Hinnefeld. The two employees were under the supervision of Raleigh Wininger who was general receiving and marketing manager. He reported to Mr. Roller, who succeeded Francis Cunningham as manager of the Service Building in November, 1963.

At the pertinent times the petitioner had distributed to new employees a book entitled "You" which contained a copy of the petitioner's no-solicitation rule, as follows:

"No solicitations, subscriptions, sale of tickets or posting of placards may be made in the store for any need or project without the knowledge and approval of the Personnel Director."

"It is a store policy that associates refrain from soliciting contributions at any time for a gift to those in supervisory or executive positions. Associates are requested not to make any such contributions if approached."

Paul Harlan was employed in the Service Building as a "lister" counting and checking merchandise against orders and putting it on a conveyor line to be marked.

During the latter part of March and April, 1963, the Retail, Wholesale and Department Store Union, AFL-CIO, was trying to organize the Service Building employees. Mr. Harlan signed a union card, attended meetings, and, with another employee, Larry Bolton, solicited other employees by passing out cards during working time. When Mr. Roller advised him of the no-solicitation rule, he signed an acknowledgment of receiving notice of such a rule but continued the solicitation during working time. He and Larry Bolton were both laid off for one week in April, 1963. This lay-off was the subject of an unfair labor practice charge and complaint. Mr. Harlan testified on behalf of the General Counsel at the hearing on that complaint. The Trial Examiner found both men were discriminatorily laid off on the ground that solicitation had been permitted with impunity for many purposes and that the rule against solicitation had been invoked here with the illegal motive of prohibiting only union solicitation. The Board carefully distinguished between the oral rule stated to Mr. Harlan in March, 1963, and the rule in the "You" book quoted above which was not being specifically found invalid.

Later Mr. Harlan received three warning slips for unsatisfactory conduct and performance. One was for leaving his work area within 30 minutes of his relief break, proceeding to the dock area and engaging in conversation with other employees who were working there, stopping off in the restroom there to smoke. Mr. Wininger said that Mr. Harlan not only left his own work but interfered with others who were working. The warning slip said that Mr. Harlan showed no ambition or initiative. Mr. Wininger said Mr. Harlan shuffled along getting back from relief periods appearing not to care if he got there or not.

Mr. Harlan said variously that his work took him to the dock and he stopped on the way to smoke and that it was pay day and he went to the dock to pick up his pay.

On the second occasion, Mr. Harlan again left his work, within 45 minutes of his relief break and went to the more distant of the two restrooms in the vicinity to smoke. He testified that he and other employees used both restrooms and he knew of no rule about them.

The third warning was for overstaying his 15-minute relief period by 10 minutes. Mr. Wininger testified that he informed Mr. Harlan about the time allowance and put a warning slip in the record because he felt that Mr. Harlan was "daring" him to do something about it. In connection with Mr. Harlan's attitude, it is perhaps noteworthy that the Trial Examiner states that Mr. Harlan's demeanor while testifying convinced him that the warnings were justified.

Subsequently, in September, 1963, Mr. Harlan came into possession of some cigarettes which he testified were damaged and which he acquired at $1 per carton. He tried to sell these to fellow employees at the same price, speaking to some six or seven of them during working hours. One of these he approached was Mr. Harlan's immediate supervisor who reported the incident to Mr. Roller who in turn passed it on to Mr. Hinnefeld. When Mr. Hinnefeld heard of this incident, he asked Mr. Harlan's supervisor to investigate and to get some statements. Catherine McCune testified that she gave a statement that Mr. Harlan approached her about buying some cigarettes and indicated that they were "Hot." Mr. Harlan denied saying that. Mr. Wininger testified that he turned over the statements secured with his recommendation that some action be taken on what he thought was a flagrant violation of the no-solicitation rule. He also testified that he had wanted Mr. Harlan discharged because Mr. Harlan caused unrest and dissatisfaction in the department; that he felt that Mr. Harlan was pushing him to see how much he would

tolerate. A check with the petitioner's legal counsel resulted in a warning from a representative of the State Excise Tax Division that such sale of cigarettes was illegal, and that petitioner should stop it to avoid potential liability. After this, Mr. Hinnefeld told Mr. Kimberlin to discharge Mr. Harlan. Mr. Hinnefeld testified that Mr. Harlan had been given more consideration than he would have received had he not been identified with the union organization.

Although there were some contradictions in his evidence, Mr. Harlan did testify that he knew that petitioner had a rule prohibiting all solicitation during working hours.

Whatever had been the case in the past, there was a known attempt to enforce the no-solicitation rule at this time, although there were some clandestine violations by way of "pools" which were hidden from the supervisors. One employee testified that he knew these would have been stopped had they come to the notice of Mr. Roller, Mr. Wininger or Mr. Cunningham.

Mr. Maxwell was employed in the Service Building as a warehouseman. He emptied the lines of merchandise and loaded it into hampers for the different stores. He testified that at the time of the union campaign he did nothing but sign a card. He did have some conversations with management personnel at the time when Mr. Harlan and Mr. Bolton were passing out cards. Mr. Kimberlin is alleged to have told him that at his age he would find jobs difficult to find. These conversations with Mr. Kimberlin, Mr. Roller and Mr. Cunningham were the subject of a prior complaint. Mr. Maxwell testified for the General Counsel in connection with that complaint. The conversations were held to be violations of § 8(a) (1) of the Act.

Mr. Maxwell had a history of drinking. Other employees testified to smelling alcohol on his breath at various times, even in the morning, but nobody testified to seeing him take a drink or have whiskey in his possession in the Service Building. Mr. Maxwell, as well as other em-

ployees, frequently ate at a tavern some two blocks away. He stated that he usually had a beer with his lunch. Some witnesses said they had never seen him take anything stronger than beer; one said he had on occasion seen Mr. Maxwell put whiskey into his beer; another said he had seen Mr. Maxwell take whiskey with his beer on occasion.

There were oral warnings to the employees in general and to individual employees against drinking during the lunch hour. One of the supervisors, Richard Harlan (no relation to Paul Harlan), testified that after he received complaints from some of the women employees and one of the buyers about Mr. Maxwell's alcoholic breath, he warned Mr. Maxwell. Another employee, James Gibb, testified that he passed on to Mr. Maxwell Mr. Roller's statement that the practice of employees coming back to the job smelling of liquor must stop, that he would not tolerate it.

Mr. Wininger testified that he spoke to Mr. Maxwell when he detected an odor of whiskey about him, that he warned Mr. Maxwell against drinking even beer. Mr. Maxwell testified that he had been given these warnings and that he understood he would be fired if he continued to drink at lunch. He testified that he had a bottle of beer with his lunch on Saturday, December 21, 1963, when he was working to make up for a lost day that week; that as he was leaving late in the afternoon, he talked to Mr. Roller who said his breath did not smell like beer or like a drink taken as long ago as lunchtime, that he had been warned; that Mr. Roller needed Mr. Maxwell but that he was going to have to let Mr. Maxwell go. Mr. Wininger testified that he had noticed the odor of whiskey about Mr. Maxwell a little earlier that afternoon, that it was strong enough to suggest a drink taken in the last 45 minutes, and he had asked Mr. Roller to check. Mr. Roller testified that he had done so in the interview to which Mr. Maxwell testified as above, found that Mr. Maxwell reeked of whiskey and concluded that he had had a drink in the last hour.

Mr. Hinnefeld testified that he talked with Mr. Roller and Mr. Wininger, ascertained that warnings had been given and directed Mr. Kimberlin to discharge Mr. Maxwell.

Mr. Maxwell testified that he encountered difficulty in finding other employment because he stated on his applications that he had been discharged for drinking. Mr. Maxwell was subsequently rehired by petitioner on a promise he would not in the future have alcohol on his breath on the job.

■ The sole question before us is whether there is substantial evidence in the record considered as a whole to support the Board's finding that the discharges were anti-union motivated and not for cause as the Trial Examiner had found.

The Board relied strongly on the prior proceedings to show an anti-union animus. There was no evidence of anti-union conduct subsequent to settlement of the prior proceedings.

The Board also relied heavily on the petitioner's failure to enforce its no-solicitation rule in the past, giving no weight evidently to the shift in practice and the fact that employee "pools" previously conducted in the open were now carried on only sub rosa. The Trial Examiner found ample evidence, including testimony of Paul Harlan himself, that petitioner was making an earnest and generally successful effort to root out the betting pools and other solicitation.

The Board was also adversely influenced by the more lenient treatment given another violator of the no-solicitation rule; Ellis Hylton. Mr. Hylton sought to sell melons and other produce to fellow employees during working hours, and was told by Mr. Cunningham to stop. Mr. Cunningham reported this fact to Mr. Roller. After clocking out that afternoon, Mr. Hylton saw Mr. Roller in the vicinity of the time clock and offered to sell him a melon. Mr. Roller asked why he continued selling melons after warning, to which Mr. Hylton said

he thought it was all right to talk to Mr. Roller. Mr. Roller told him to stop solicitation immediately, to move his produce truck out of the Service Building parking lot, and that a warning slip would be placed in his record.

■ There was no evidence of any taint of illegality about the melons as with Mr. Harlan's cigarettes. Nor was there any evidence of prior disciplinary difficulties with Mr. Hylton, or of such attitude as even in the restraining atmosphere of a hearing was made manifest to the Trial Examiner by Mr. Harlan's demeanor on the stand. That demeanor which so impressed the Trial Examiner is not apparent from the printed transcript of the testimony before us which is all the Board had to consider. Its members did not see or hear Mr. Harlan. As the Trial Examiner said, past union activity cannot immunize an employee from managerial control or properly founded disciplinary action. N.L.R.B. v. Florida Steel Corp., 5 Cir., 1962, 308 F.2d 931, 933.

■ The decision of the Trial Examiner is a part of the record before us and is entitled to considerable weight where the issue turns on the credibility of witnesses whom the Trial Examiner alone heard and saw. Flack v. N.L.R.B., 7 Cir., 1963, 327 F.2d 396, 400.

On review of the whole record, we cannot conscientiously find that the evidence supporting the Board's decision is substantial when viewed in the light of that whole record. N.L.R.B. v. Latex Industries Inc., 6 Cir., 1962, 307 F.2d 737, 738. The Board's Order is therefore reversed. The Board's petition seeking enforcement is denied.

Enforcement denied.

KILEY, Circuit Judge (dissenting).

I respectfully dissent.

The majority opinion rests upon the grounds that the Board relied strongly

upon the prior unfair practices proceeding as showing a context of anti-union bias, when there was no evidence of anti-union conduct since those proceedings ended; that the Board erroneously relied upon non-enforcement of a no-solicitation rule without considering the evidence of a "shift" to enforcement, and that the Trial Examiner found there was ample evidence that petitioner tried with general success to root out gambling pools and other solicitation; that the Board was improperly influenced by the petitioner's leniency toward a fellow employee who was guilty of soliciting; that the Board had not the benefit of Harlan's demeanor as a witness, which had a significant impact on the Examiner; that the Board's decision rested upon determinations of credibility without due weight given the Examiner's findings; and that the Board's order is not substantially supported by the record as a whole.

The Examiner did not reach his conclusion in favor of petitioner "despite his finding of a 'strong Union animus,' "[1] as petitioner's brief states. He assumed the animus and decided Harlan's testimony itself showed cause for his discharge. He was unable to find "relevant union animus of the quality necessary" to characterize the discharges as pretexts. The Board disagreed. So do I.

The Board pointed out that the Examiner's decision was made before the Board unanimously sustained a Trial Examiner's earlier decision that petitioner had unlawfully laid off Harlan in April of 1963 for solicitation of union recognition cards, and that it had unlawfully interrogated Maxwell about his union activity and threatened him with the loss of his job.[2] The Board was entitled to look to the earlier proceeding to "shed light" upon the character of petitioner's conduct here, even though the evidence of the charges in that earlier case preceded by more than six months the filing of the present complaint.

1. Brief and Argument for Petitioner, p. 33.

2. The Wm. H. Block Company, 150 N.L.R.B. 341 (1964).

The Board's decision in the earlier proceeding found that petitioner's no-solicitation rule was discriminatorily enforced to prohibit solicitation only of union cards. It is true that after Harlan's then unlawful "layoff" for soliciting cards he was shown a copy of a written rule against solicitation in general. But on the entire testimony, including that of manager Wininger, regarding enforcement of the rule, the Board in the case before us was not precluded from inferring that the sudden and strict enforcement after Harlan's return to work and resulting in his discharge raised substantial doubt as to petitioner's motives, in view of the enforcement as to his fellow workers. A reading of the testimony, in my opinion, does not justify the Trial Examiner's finding that there was ample testimony that petitioner was largely successful in its attempts to root out solicitation.

I fail to see what importance the Board had to attach to the Trial Examiner's appraisal of Harlan's demeanor as a witness in determining whether he was unlawfully discharged for "solicitation" of cigarette sales. The facts are admitted.

Harlan was fired for trying to sell cigarettes damaged by fire. There is merely a hearsay suggestion that there was a taint of illegality about this. He had testified in August of 1963 against petitioner and in support of the complaint arising from his "layoff" for union activity in April. He was fired October 4, 1963, for having discussed sales of the cigarettes with several fellow employees and with two of his superiors on September 28. Harlan testified that neither of the latter two told him he was not supposed to solicit the sales. One of these testified at the hearing but did not deny Harlan's testimony. The other was not called. About this time a fellow employee drove a truck with melons and vegetables to petitioner's plant. In the morning he was told to stop soliciting sales of melons. Despite the warning he solicited again in the afternoon. He was disciplined with only a warning notice.

This incident was a proper consideration in the Board's decision as to petitioner's "shift" in enforcement of its no-solicitation rule.

The Board's decision did not disagree with or overturn any credibility determinations of the Examiner. The Board drew inferences from undisputed testimony of witnesses for both the General Counsel and petitioner, and its decision has substantial support on the record as a whole. Harlan had received three written warnings: one in June of 1963 for leaving his work area at non-break time; one in July for smoking in the restroom not closest to his work station; and one on September 18 for taking a net seven or eight minutes in excess of the time permitted workers during a relief break. These warnings and his subsequent conduct in solicitation of cigarette sales took place in the climate of anti-union bias expressed in petitioner's conduct in April.

Maxwell worked for petitioner for about five years before his discharge in December of 1963. In his first year he was informed that the company did not want employees to come to work with an alcoholic smell on their breath. During his five years a superior noticed alcohol on his breath two or three times a week. He did not tell Maxwell it was company policy to discharge anyone for drinking off-the-job, but only for drinking on-the-job or disorderly conduct resulting from drinking. This witness said Maxwell was a good worker and "very courteous." Petitioner's manager Wininger smelled alcohol on Maxwell's breath for the first time in October of 1963, and told him he would not tolerate Maxwell's drinking even beer at lunch since that made him "undesirable" to the women workers. He did not notice the smell again until the evening of Maxwell's discharge when he "smelled a vile odor of whiskey" about Maxwell, who had stopped at Wininger's door for a moment before leaving for the day. Wininger then called Roller, who testified he asked Maxwell into his office and de-

tected a strong odor of whiskey.[3] Maxwell admitted to a beer on his lunch hour. The discharge followed. Petitioner re-employed Maxwell about two weeks before the hearing of the charges before us.

The Board had an ample basis for concluding that these discharges, in light of the previous union activity of Harlan and Maxwell and their testimony against petitioner in the earlier hearing, were unlawful and in violation of sections 8(a)(3) and (4). I would enforce the order.

---

**3.** No contention is made that anyone ever saw Maxwell drink at the Service Building, as opposed to having had a drink with lunch at a nearby tavern.