**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WISCONSIN ALUMINUM FOUNDRY CO., Inc., Respondent.**

**WISCONSIN ALUMINUM FOUNDRY CO., Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 18068, 18073.**

United States Court of Appeals, Seventh Circuit.

Feb. 19, 1971.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison Brown, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Attys., N. L. R. B., for National Labor Relations Board.

Rudolph O. Schwartz, Manitowoc, Wis., for Wisconsin Aluminum.

Before FAIRCHILD and PELL, Circuit Judges, and ESCHBACH, District Judge.[1]

1. Judge Jesse E. Eschbach is sitting by designation from the United States District Court for the Northern District of Indiana.

ESCHBACH, District Judge.

This matter is before us upon application of the National Labor Relations Board (Board) in No. 18068, pursuant to § 10(e) of the National Labor Relations Act (Act), as amended, Title 29 U.S. C.A. §§ 151–188, § 160(e), for enforcement of its order dated December 1968. No. 18073 is also before the court upon the cross-petition of the Wisconsin Aluminum Foundry Co., Inc., (Company) to review the Board's order. The unfair labor practice charges involved in Nos. 18068 and 18073 resulted from the Company's failure to pay a Christmas bonus to its employee Lorin Haver in December 1967.

The Board's order, amending and adopting the trial examiner's recommended order, directed the respondent Company to cease and desist from (1) refusing to bargain collectively with the Union[2] regarding Christmas bonuses or any other term or condition of employment by unilaterally effectuating changes in such bonuses or terms and conditions in violation of § 8(a) (5) and (1) of the Act, 29 U.S.C.A. § 158(a) (5) and (1)[3]; (2) discouraging membership in the Union by withholding a Christmas bonus or otherwise discriminating with regard to the hire and tenure of employees, or any term or condition of their employment, in violation of § 8(a) (3) and (1) of the Act, 29 U.S. C.A. § 158(a) (3) and (1);[4] and (3) interfering with, restraining, or coercing employees by threatening employees with economic reprisal because of union membership and activities in violation of § 8(a) (1) of the Act, 29 U.S.C.A. § 158(a)

(1). Affirmatively, the Company was ordered to pay employee Haver the amount due to him for the 1967 Christmas bonus, to make pertinent records available for Board inspection and copying, and to post appropriate notices. The Board's application in No. 18068 will be allowed insofar as it finds a violation by the Company of § 8(a) (5) and (1) and 8(a) (3) and (1) of the Act, but will be denied with regard to its finding of an independent violation of § 8(a) (1). In No. 18073, the Company's petition to review and set aside the Board's order will be allowed as to the independent violation of § 8(a) (1), but will be denied as to the violations of §§ 8(a) (5) and (1) and 8(a) (3) and (1).

The Company, a Wisconsin corporation, is engaged in the manufacture of aluminum products. It is undisputed that the Company is an employer engaged in commerce within the meaning of § 2(6) and (7) of the Act, 29 U.S.C.A. § 152(6) and (7), and that the Union is a labor organization within the meaning of § 2(5) of the Act, 29 U.S.C.A. § 152 (5).

The facts underlying Nos. 18068 and 18073 may be summarized as follows. On May 18, 1967, the Union filed a petition with the Board seeking certification as the collective bargaining representative of the Company's clerical employees. At a hearing to determine the composition of the unit, the Company contended that Haver, an employee since 1947 who had been instrumental in organizing the office workers, was a supervisor and thus should be excluded from the unit. The Company based its contention on the

2. Office and Professional Employees International Union, Local No. 9, AFL–CIO.

3. Section 8(a) (1) and (5) of the Act provides, inter alia:
"Sec. 8. (a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
(5) to refuse to bargain collectively with the representatives of his em-

ployees, subject to the provisions of section 159(a) of this title."

4. Section 8(a) (3) of the Act provides, inter alia:
"Sec. 8. (a) It shall be an unfair labor practice for an employer—
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

ground that Haver, in addition to being the sole payroll clerk, acted as secretary of a safety committee, assisted employees in filling out insurance and workmen's compensation claims, and kept a necessary supply of certain items for production. The Board, however, found that Haver was a rank-and-file employee and therefore included him in the unit even though he was salaried and had received an annual Christmas bonus along with management for the 19 preceding years. Subsequently, the Union won the election and was certified as bargaining representative in July 1967.

After hard bargaining, the parties reached an agreement on October 25, 1967 providing for hourly increases in wage rates for all clericals, plus a special additional hourly rate for Haver as compensation for additional duties performed only by him. Prior to the effective date of the Union contract, Haver had received a fixed salary of $400 per month (or $4,800 per year) and an annual bonus in 1965 and 1966 of $500,[5] making his annual earnings $5,300, exclusive of overtime. Haver also steadily supplemented his salary with nine and one-half hours of overtime on a semi-monthly basis.

Under the Union contract, Haver's hourly rate was fixed at $2.80 per hour for September 1, 1967 to October 1, 1968 and $2.90 per hour thereafter. The hourly wage rate reflected a premium which was negotiated as compensation for his duties in addition to those of payroll clerk. In other words, Haver received annual earnings under the Union contract of $5,460 until October 1, 1968 and $5,655 from that date until the contract expired on September 30, 1969. Prior to the Union contract, Haver had received $2.36 per hour for overtime work; under the Union contract he received $2.80 and $2.90 for the first two and one-half hours of overtime and $4.20 and $4.35 for each additional hour of overtime in the workweek. Finally, Haver received additional fringe benefits under the Union contract. No reference, however, was made to the word "bonus" in the contract or during the negotiations, although both the Company and the Union discussed Haver's bonus in their separate preparations for the negotiations. Haver, as steward for the Union, attended each one of the bargaining sessions.

In December 1967 Haver did not receive a Christmas bonus. On December 22, 1967, Haver asked Harry Schwartz, president of the Company, whether he was going to receive a Christmas bonus, and Schwartz replied that no bonus would be paid since bonuses were paid only to management. Haver then presented Schwartz with a grievance, and several days later the Company's attorney notified the Union that it was willing to discuss the matter. The Union elected not to proceed with arbitration as provided for in Article X of the parties' contract but, instead, filed charges with the Board.

On May 28, 1968, the trial examiner, James F. Foley, recommended that the complaint be dismissed in its entirety. In his analysis, findings, and conclusions, the trial examiner found that the wage structure took into account the bonus and that the bonus was negotiated by the Union and the Company in the presence of Haver, although no reference was made to the term "bonus." The examiner also found that the Company, as a matter of policy, pays bonuses only to management and does not pay bonuses to rank-and-file employees whether they be office clericals or production and maintenance employees in units represented by other unions. The Board, one member dissenting, found on December 6, 1968 that the Company had violated § 8(a) (1), (3), and (5) of the Act as charged in the Union's complaint. The Board was unable to conclude that the Company was negotiating on the basis of Haver's past earnings, including the bonus, and found that since

---

5. During the 19 years preceding 1967, Haver had received Christmas bonuses in amounts ranging from an initial $100 to the $500 bonuses received in 1965 and 1966.

the bonus constituted wages and was a mandatory subject of bargaining, the Company had unilaterally discontinued the bonus in violation of § 8(a) (5) and (1) of the Act.

The Company first contests the power of the Board to issue the complaint and contends that the Union should have exhausted grievance-arbitration procedures since it initiated such procedures. Article X of the collective bargaining agreement provides for a grievance procedure and arbitration of controversies arising over the interpretation of or adherence to its terms and provisions. It is the Board's contention, however, that under § 10(a) of the Act, 29 U.S.C.A. § 160(a), its power to determine unfair labor proceedings is not affected by other means of adjustment or prevention established by the agreement. The Board, referring to its holding that the bonus had not been covered by the agreement, contends that no question of contract interpretation was involved in the dispute, making grievance and arbitration procedures inapplicable. Even if a question of contract interpretation had been involved, as the examiner concluded, the Board contends that it had discretion to issue the complaint or to defer action until arbitration was completed, since the facts created both an arbitrable dispute and a possible unfair labor practice.

We agree with the Board on the initial question of whether it should have withheld its processes because the Union, the charging party, had initiated and then abandoned the grievance procedures provided for in the collective bargaining agreement. Under § 10(a) of the Act, the Board is empowered to prevent any person from engaging any unfair labor practice listed in § 8 affecting commerce, and such power is not affected "by any other means of adjustment or prevention that has been * * * established by agreement * * *." 29 U.S.C.A. § 160(a). Where the facts of a case create both an arbitrable dispute and a possible unfair labor practice, the Board has discretion to issue a complaint or to defer action until an arbitra-

tion has been completed. NLRB v. Thor Power Tool Co., 351 F.2d 584, 587 (7th Cir. 1965). *See* NLRB v. Acme Indus. Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed. 2d 495 (1967); NLRB v. Scam Instrument Corp., 394 F.2d 884, 887 (7th Cir. 1968), cert. denied, 393 U.S. 980, 89 S.Ct. 449, 21 L.Ed.2d 441 (1968). The bonus was not mentioned in the contract, and therefore the facts of this case arguably created both an arbitrable dispute and a possible unfair labor practice. The examiner and the Board were in disagreement themselves with regard to whether a question of contract interpretation was present. Thus, we find that the Board properly exercised its discretion in issuing the complaint, since a possible unfair labor practice existed.

## I. VIOLATION OF § 8(a) (5) AND (1)

In its petition, the Company contends that no substantial evidence on the record as a whole supports the Board's finding that the Company violated § 8(a) (5) and (1) by withholding the bonus. Arguing that the bonus was in fact considered although not expressly mentioned during the negotiations, the Company denies that it violated § 8(a) (5) of the Act by unilaterally withholding the bonus, since it did no more and no less for the members of the Union than the agreement called for. The Company also takes the position that where the parties to a labor agreement have put their agreement in writing, there is a presumption that the entire agreement of the parties has been reduced to writing, citing NLRB v. Nash-Finch Co., 211 F.2d 622 (8th Cir. 1954).

The Board, on the other hand, contends that substantial evidence on the record as a whole supports its finding that the Company violated § 8(a) (5) and (1) by discontinuing Haver's bonus without notice to, or negotiations with, the Union. Noting that the Board did not overturn any of the trial examiner's credibility resolutions but merely drew different conclusions from the facts, the Board contends that it reasonably con-

cluded that a violation had occurred. Finally, the Board argues that it was not the Union's burden to raise the bonus issue during the negotiations and that its silence about the bonus cannot be interpreted as a waiver of the right to bargain about it.

■ It is settled that where employees are represented by an authorized bargaining agent, the employer violates § 8(a) (5) by unilaterally effecting changes in wages or conditions of employment. *E. g.*, NLRB v. Katz, 369 U.S. 736, 747, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); Scam Instrument Corp., *supra*, 394 F.2d at 887. Both parties agree that the bonus here involved constitutes "wages" within the meaning of the Act. The crucial issue which presents itself in this case is whether the parties to the collective bargaining agreement negotiated Lorin Haver's bonus as part of his wages.

■■ The standard which this court must follow in reviewing the Board's order is whether on the record as a whole there is substantial evidence to support its findings; the meaning of "on the record as a whole" encompasses not only testimony of witnesses and the Board's findings and conclusions but also the report of the trial examiner. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This court may not displace the Board's choice between two fairly conflicting views even though we might justifiably have made a different choice had the matter been before us *de novo*. *Universal Camera Corp., supra* at 488, 71 S.Ct. 456, quoted in NLRB v. Walton Manuf. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962). However, we are not barred from setting aside a Board decision when we cannot "conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp., *supra*.

The record reveals that the trial examiner, the majority of the Board, and the dissenting member of the Board each advanced a set of computations to determine whether Haver's bonus was in fact negotiated into his wage increases under the Union contract.

*(A) The Trial Examiner's Computations*

Kubicki, the chief negotiator for the Union, testified that the Union representative made an initial demand or proposal of three dollars per hour for Haver. Kubicki also stated that the three-dollar figure was based on Haver's monthly base rate plus his premium time which he had been awarded during the past years.

In reaching his determination, the trial examiner found that Kubicki had caucused with Haver in preparation for the negotiations and had discussed the bonus with him. The trial examiner also found from the demeanor of the witnesses and the testimony of record that "the Union and Kubicki played a game of cat and mouse" with the Company during the negotiations of Haver's wage rate. The trial examiner thus concluded from the evidence, including the Union's proposals and the Company's counterproposals during the negotiations, that the Union and the Company did negotiate the bonus in fact, although no reference was made explicitly to the term "bonus."

In his computations, the trial examiner compared Haver's pre-contract salary and $500 bonus, without overtime, to his yearly wages without overtime under the Union contract. According to the trial examiner, the Company had a right to assume that the Union was negotiating the entire earnings, including the bonus, since the Union's demand for three dollars per hour for 37½ hours would have brought Haver considerably more earnings than his pre-contract annual earnings including the bonus. In his original demand for three dollars, Kubicki was asking for annual earnings of $5,850 compared with the $4,800 salary and $500 bonus which Haver had

been receiving. The parties agreed upon annual earnings of $5,460 until September 30, 1968 and $5,655 beginning October 1, 1968. The trial examiner further found that if the bonuses were to remain in effect, Kubicki asked initially for $6,350 per year for Haver compared with the $5,300 he had received, an increase of $1,050. If the bonus were to be continued, he found that the parties negotiated $5,960 for the period ending September 30, 1968 and $6,155 for the period beginning October 1, 1968, increases of $660 and $855 for the two periods.

As additional support for his conclusion, the trial examiner compared the increase in hourly rates for the other clericals in the unit with Haver's increase and found that the bonus for Haver had been considered in arriving at the initial demand of three dollars per hour.

### (B) The Board's Computations

The Board compared Haver's salary, including overtime, with his wages without overtime under the Union contract. Although the Board found that the trial examiner's computations were accurate insofar as they went, it found that he had erred in failing to take overtime into proper consideration. Prior to the Union contract, the Board found that Haver was receiving approximately $586 per year for overtime work, making his total pre-contractual earnings $5,886 instead of $5,300. Since the Company declared at the end of the negotiations that Haver would receive no more overtime work, the Board found that his pre-contractual compensation was in fact about $426 more than the $5,460 which he would earn under the Union contract. On this basis, the Board concluded that it would be unreasonable to infer that the Union, having negotiated substantial raises for other clericals in the unit, would have agreed on a wage for Haver "which in actuality amounted to a reduction in earnings."

### (C) Computations of John H. Fanning, Dissenting Member of the Board

Fanning in his dissent compared Haver's wages, including overtime, before and after the Union contract and concluded that the bonus was negotiated. According to Fanning, the Board disregarded the fact that Haver worked 42 hours per week prior to the Union contract and 37½ hours under the Union contract. The Union contract contained overtime provisions, and Fanning noted that no discussion about the ending of overtime work for Haver took place until the close of negotiations. Fanning concluded that the loss of the bonus was being negotiated because at the time of negotiations, the bonus was the only element of Haver's compensation which was certain to change. According to Fanning's reasoning, the true comparison would be the amount Haver would earn under the Union contract if he worked 42 hours, $6,250 per annum, as against the amount he earned prior to the Union contract, $5,886 per annum.

The Company takes the position that it has done no more and no less for the members of the Union than its agreement with the Union called for, citing NLRB v. Nash-Finch Co., 211 F.2d 622 (8th Cir. 1954). In addition, the Company contends that there is a presumption that the entire agreement of the parties to a labor agreement has been reduced to writing when they have put such agreement in writing.

█ In order to effectuate the relinquishment of a collective bargaining right under the provisions of a collective bargaining agreement, we think that the preferable rule requires that waiver be in "clear and unmistakable language." E. g., Beacon Journal Publishing Co. v. NLRB, 401 F.2d 366, 367 (6th Cir. 1968); Federal Compress & Warehouse Co. v. NLRB, 398 F.2d 631, 636 (6th Cir. 1968); Leeds & Northrup Co. v. NLRB, 391 F.2d 874, 878 (3d Cir. 1968); Dura Corp. v. NLRB, 380 F.2d 970, 973 (6th Cir. 1967). As illustrated in the

above computations, the circumstances in this case leave the intentions of the parties in doubt, and the failure by the Company and Union to expressly include or exclude the bonus in their negotiations is subject to conflicting inferences. The computations illustrate the difficulty and disparity in attempts by the trial examiner and Board members to interpret the parties' silence on the issue of Haver's bonus. We find it no more logical to infer that the Union waive its right to bargain about the bonus than to conclude that bargaining on the subject of the bonus was deferred. *See Federal Compress, supra,* 398 F.2d at 637.

■ Both parties agree that no express reference was made during the contract negotiations to Haver's bonus; the record shows only that the parties discussed the bonus in their separate caucuses. The Board emphasized the "total lack of evidence that the Union had any inkling" that the Company intended to discontinue the bonus. Thus, the Board properly concluded that the Union was not estopped to complain of the discontinuance of the bonus, admittedly a part of wages, since it had not raised the question during the contract negotiations. *See* General Telephone Co. of Fla. v. NLRB, 337 F.2d 452, 454 (5th Cir. 1964). We find no "clear and unmistakable language" by which the Union relinquished its right to bargain on the subject of Haver's bonus. The Board properly concluded that the references to the bonus, made in separate caucuses, do not furnish proof of an intention on both sides to include the issue of the bonus in their agreement on wages. *See* NLRB v. Wonder State Mfg. Co., 344 F.2d 210, 214 (8th Cir. 1965) (unilateral increase in wages).

The controlling question in *Nash-Finch Co.,* cited by the Company in support of its petition, was whether or not hospitalization, group life insurance, and a Christmas bonus could be unilaterally canceled, withdrawn, or withheld by the employer after a collective bargaining agreement making no explicit mention of those benefits had been entered into by the union and employer. *Nash-Finch Co., supra,* 211 F.2d at 623. Although the court found no violation of § 8(a) (5) on the ground that the union and employer had negotiated for an agreement completely covering the obligations of the employer toward its union employees, we think that *Nash-Finch* is factually distinguishable from the case now before us. In *Nash-Finch,* the court found that the question of maintenance of the insurance and bonus benefits was not ignored in the negotiations between the parties to the agreement. In a first draft of a proposed contract submitted by the union to the employer, the union had inserted a "Maintenance of Standards" provision which would have required the employer to maintain its insurance and bonus plans for its union employees. Such provision, however, was unacceptable to, and was not accepted by, the employer. *Nash-Finch Co., supra* at 626.

In *General Telephone Co. of Fla., supra,* the union was found not to have waived its right to bargain concerning Christmas checks. The court, affirming the Board's decision that § 8(a) (5) had been violated, noted that "little or no reference" had been made to the checks during the contract negotiations and that the absence of an existing benefits clause in the contract did not necessarily show that the union meant to forego any right to such checks or that the company could reasonably so have interpreted it. *General Telephone, supra,* 337 F.2d at 454. In the present case, the record shows only that at the most the subject of bonuses was mentioned by the parties at separate caucuses.

■ We find that the record as a whole supports the Board's finding that the Company and the Union did not negotiate on the subject of bonuses, that the Union did not waive its right to bargain over the bonus, and that the Company acted unilaterally in taking such action. *See Wonder State Mfg. Co., supra,* 344 F.2d at 215.

## II. VIOLATION OF § 8(a) (1)

The charge of an independent violation of § 8(a) (1) by the Company is based on the conversation between Haver and President Schwartz on December 22, 1967, concerning the discontinuance of Haver's bonus. The testimony of both men before the trial examiner was conflicting as to Schwartz' explanation to Haver about the discontinuance. According to Haver's testimony, Schwartz stated that no bonus had been paid because Haver was no longer part of management and that he had "cut his own throat" by going over "on the other side of the fence" to join the Union. Haver further testified that Schwartz told him that bonuses were paid only to those to whom the Company wanted to pay bonuses and that Haver could be one of management if he dropped out of the Union.

On the other hand, Schwartz testified that he explained to Haver on December 22 that bonuses were paid only to management and that therefore Haver had been left out. Schwartz also denied, when testifying, that he told Haver that he could be one of management if he dropped out of the Union.

Based on his observation of the witnesses and his evaluation of the testimony and the evidence of record, the examiner credited Schwartz' denial that he told Haver that he would pay Haver a bonus if he dropped out of the Union. Nor did the examiner find that Schwartz said to Haver that his bonus was being discontinued because of his membership in the Union and his Union activity.

The Company contends that the Board did not give proper weight to the findings and conclusions of the trial examiner and that there is no substantial evidence sufficient to overcome the trial examiner's determination of credibility.

The Board, in its decision and order, found that the Company had violated § 8(a) (1) by indicating to Haver that his failure to receive a bonus was the result of his membership in and activities on behalf of the Union. The Board's conclusion was based on its reasoning that the trial examiner's determination of credibility was inconsistent with his finding that the bonus was negotiated into the wage structure. In other words, the Board found illogical (1) the trial examiner's belief that Schwartz told Haver that he would no longer receive a bonus because he was not a part of management and (2) the trial examiner's conclusion that the bonus had been negotiated into the contract for Lorin Haver, a rank-and-file employee.

Despite the Board's objection to what it viewed to be an inconsistency, no evidence other than the testimony of Schwartz and Haver was introduced; thus, our determination of the question of an independent violation of § 8(a) (1) turns solely on the credibility of the witnesses. Accordingly, the significance of the trial examiner's report is greater in this case than in other cases where the importance of credibility plays a smaller role. *See Universal Camera Corp., supra*, 340 U.S. at 496, 71 S.Ct. 456, quoted in Flack v. NLRB, 327 F.2d 396, 400 (7th Cir. 1963). We find that the Board did not accord the findings of the trial examiner the weight commanded by the facts presented in this case and that the evidence supporting the Board's order is not substantial with regard to an independent violation by the Company of § 8(a) (1) of the Act. *See Universal Camera Corp., supra.*

## III. VIOLATION OF § 8(a) (3) AND (1)

With regard to its alleged violation of § 8(a) (3), the Company submits that only discriminations which encourage or discourage membership in any labor organization are prohibited. Since none of the four union members in the Company's office other than Haver received a Christmas bonus prior to certification of the Union, the Company contends that no such discrimination was effectuated. The only fact which the Company can find to show such discrimination is the denial to Haver of certain benefits—

the bonus for which his Union allegedly did not bargain.

The Board contends, on the other hand, that Haver's duties and responsibilities remained unchanged throughout the period in question and that Union considerations motivated the withholding of the 1967 bonus in violation of § 8(a) (3) and (1) of the Act.

 While we agree with the Company's position that discrimination alone is not enough, we disagree that the facts of this case do not reveal a discrimination by the Company to discourage membership in the Union. "Motivation of the employer in such discrimination is the important factor." NLRB v. Electric Steam Radiator Corp., 321 F.2d 733, 737 (6th Cir. 1963). However, specific evidence of an intent to discourage union membership is not an indispensable element of proof of violation of § 8(a) (3). *Electric Steam Radiator Corp., supra.* Instead, where the employer's conduct inherently discourages union membership, intent is sufficiently established. *Electric Steam Radiator Corp., supra.* Whatever purpose the Company may have had in adversely affecting Haver's wages, it necessarily discouraged membership in the Union so long as that action would not have been taken in the absence of union activity. Allis-Chalmers Mfg. Co. v. NLRB, 162 F.2d 435, 440 (7th Cir. 1947).

 From the record as a whole, we find that substantial evidence supports the Board's finding in the case that the Company failed to pay Haver's bonus because of anti-union motivation. *See Electric Steam Radiator Corp., supra,* 321 F.2d at 738. In reaching its conclusion, the Board was allowed to infer from the proven facts such conclusions as may reasonably be based thereon. *Electric Steam Radiator Corp., supra.* It is undisputed that Haver's duties and responsibilities between Christmas 1966 and Christmas 1967 were identical; the only difference in Haver's status was his Union membership. The trial examiner found that the Company, as a matter of policy, pays bonuses only to management and not to rank-and-file employees. Furthermore, Haver and Schwartz testified, and the Board found, that bonuses were paid only to management. President Schwartz himself testified that he told Haver that he would not receive a bonus in 1967 because he was no longer part of management. On the basis of these proven facts, the Board concluded that Haver, who had never been a managerial employee and who had previously received the bonus as a form of compensation, was penalized by the Company's conduct in violation of § 8(a) (3). Thus, we find that substantial evidence from the record as a whole does support the Board's finding that the Company violated § 8(a) (3).

Accordingly, in No. 18068, the application of the Board for enforcement of its order is allowed with regard to its finding of violations of §§ 8(a) (5) and (1) and 8(a) (3) and (1), but is denied with regard to its finding of an independent violation of § 8(a) (1). In No. 18073, the petition of the Company to review and set aside the Board's order is allowed with regard to the finding of an independent violation of § 8(a) (1), but is denied with regard to violations of §§ 8(a) (5) and (1) and 8(a) (3) and (1).

As the result of our determination to deny enforcement of the Board's finding of an independent violation of § 8(a) (1), Paragraph 1(c) of the Board's order is set aside. In addition, Paragraph 2(c) of the order is set aside insofar as it requires inclusion in the posted notice to all employees of Subparagraph (3) in the list of findings made by the Board and the subparagraph containing thirteen words about economic reprisal for union activities immediately preceding the employer's signature. All other portions of the Board's order will be enforced.

PELL, Circuit Judge (dissenting).

Because of the careful and scholarly analysis of the matters here involved

contained in the majority opinion written by Judge Eschbach, I am reluctant to dissent. Nevertheless, my examination of the record compels me to the belief that the majority has reached an incorrect result. In so believing, I am joined by the Trial Examiner and one of the three members of the National Labor Relations Board deciding the case below. I would particularly agree with member Fanning of the National Labor Relations Board that Haver's bonus, to the extent that he had any valid basis for claiming a right thereto, was eliminated as a result of the 1967 contract negotiations.

The statutorily mandated right of a certified union to insist that the employer, whose employees the union represents, bargain with it should in my opinion be accompanied by a concomitant legal responsibility to bargain in good faith and to abide by the terms and provisions of the resulting labor agreement. This is not to say that the employer can engage in unilateral conduct affecting the subjects of the bargaining. This no doubt is true whether the particular unilateral conduct pertains to one which specifically is referred to in the contract or whether it is one which merely was a potential subject of bargaining. Here, however, it appears to me that the bonus, admittedly a proper potential subject in the negotiation, was in fact bargained away. Notwithstanding payment of a Christmas bonus to Haver for 19 years prior to 1967, he was not under the particular circumstances of this case entitled to claim that he had some type of fixed contractual or vested right to the continuance of the payment of the bonus.

There seems to be no dispute that the employer here as a matter of policy paid bonuses only to management employees. It did not pay bonuses to rank-and-file employees whether they were office clericals or production and maintenance employees. There seems to be no reason

for doubting the company's good faith in contending that the company in pre-union days had considered Haver as having "both supervisory and managerial authority." This was the position the company took at the time of the determination of the unit: The Board's Regional Director determined that Haver was properly in the unit and on this determination he left the category in which the company had considered him to be and thereby relinquished any sort of contractual claim to the continued payment of a Christmas bonus.

Haver was one of the two negotiators in the six lengthy sessions leading to a contract and there is nothing in the record to indicate that the above matters pertaining to the payment of Christmas bonuses only to managerial employees and the company's position of theretofore having treated him as a managerial employee was any secret insofar as Haver was concerned. The contract negotiations surely must have been conducted in this context.

The Trial Examiner, who had an opportunity to observe the demeanor of the witnesses and evaluate the credibility of their testimony,[1] found that the union negotiators played "a game of cat and mouse" in the negotiations for Haver's wage rate. This was not a case where the matter of Haver's wage structure might easily have been lost in the shuffle of negotiations as he was one of the two negotiators and apparently only four employees altogether were involved. While Haver was acting in a representative capacity in the negotiations, I would see no reason for ascribing such unhuman motivation as to think he would wholly forget or ignore his own economic needs and desires during the course of the negotiating sessions.

In my opinion the record fully supports the Trial Examiner's finding as follows:

"The bargaining was hard, and the Union apparently felt that the only

---

1. The majority of the Board in its decision noted "that in reaching this conclusion the Board did not overturn any of the Trial Examiner's credibility resolutions, but merely differed with him concerning conclusions to be drawn from the established facts." This to me has some aspects of "differing" without a distinction.

way to get Haver a higher figure was to propose the $3 an hour figure, and remain silent about the bonus, and then allege an unfair labor practice or a breach of contract if the bonus was not paid. The Union had a duty to negotiate the bonus and not remain silent. The evidence, including the evidence of its proposals, shows it did negotiate it in fact, although it did not make reference to the term 'bonus.' The evidence, including the evidence of counterproposals of Respondent, shows that in fact Respondent was negotiating on the basis of Haver's past earnings including the bonus, although it did not use the term 'bonus.' "

Kubicki, the principal negotiator for the union, admitted that in a caucus with Haver the bonus had been discussed. He further admitted that it was general practice in negotiating contracts to attempt to negotiate all the terms and conditions of employment into the contract.

I find the matters here involved controlled by N. L. R. B. v. Nash-Finch Co., 211 F.2d 622 (8th Cir. 1954). The majority opinion purports to distinguish *Nash-Finch* on the factual differentiation that in the *Nash-Finch* negotiations the union had earlier proposed a "Maintenance of Standard" provision, which would have required the employer to maintain its insurance and bonus plan for its union employees. While it is true in *Nash-Finch* that the union proposal might have had this effect, the language of the union proposal was not specifically so couched. Instead, the union proposal in *Nash-Finch*, which the company refused to accept, was a general boiler-plate type proposal reading as follows:

"The Employer agrees that all conditions of employment relating to wages, hours of work, overtime differentials, and general working conditions shall be maintained at not less than the highest minimum standards in effect at the time of the signing of this agreement, and the conditions of employment shall be improved wherever specific provisions for improvement are made elsewhere in this agreement." (at p. 624)

Such a provision is not uncommon to union contracts and the fact that they are proposed and are inserted in contracts is indicative to me that Kubicki was correct in testifying that the general practice in negotiating contracts is to attempt to negotiate all the terms and conditions of employment into the contract. When the parties sit down and work out in detail a written instrument purporting to cover terms and conditions of the employment, the unwritten rules pertaining thereto which had been in effect during the pre-union days if viable should be spelled out. Failure to do so would certainly be the basis of the presumption of abandonment which seems clear in the case before us, which presumption I would not find as having been overcome.

I find the language of the Eighth Circuit in *Nash-Finch, supra,* persuasive where the court states at p. 626:

"Where parties to a contract have deliberately and voluntarily put their engagement in writing in such terms as import a legal obligation without uncertainty as to the object or extent of such engagement, it is conclusively presumed that the entire engagement of the parties and the extent and manner of their undertaking have been reduced to writing."

and at p. 627:

"It seems to us that what the Board has done, under the guise of remedying unfair labor practices, is to attempt to bestow upon the respondent's union employees the benefits which it believes the Union should have obtained but failed to obtain for them as a result of its collective bargaining with the respondent on their behalf."

I concur in that part of the majority decision with regard to the lack of an independent violation of Section 8(a) (1) but for the reasons hereinbefore set out I would deny the application of the

Board for enforcement of its order in its entirety and would grant the company's petition to review and set aside the Board's order.