**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**URBAN TELEPHONE CORPORA-TION, Respondent.**

**No. 73-1094.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1973.

Decided June 17, 1974.

Peter G. Nash, Gen. Counsel, William M. Bernstein, Attys., N. L. R. B., Washington, D. C., for petitioner.

Robert K. Drummond, Urban Telephone Corp., Milwaukee, Wis., for respondent.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and CHRISTENSEN, Senior District Judge. *

SWYGERT, Chief Judge.

The NLRB has applied to this court pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), for enforcement of its October 26, 1972 order issued against the respondent Urban Telephone Corporation [hereinafter referred to as the company]. The decision is reported at 199 NLRB No. 119.

The company is a Wisconsin corporation which provides telephone service. The union, International Brotherhood of Electrical Workers, AFL–CIO, petitioned the NLRB for certification as the bargaining representative for a stipulat-

ed unit of employees. On April 16, 1971, the NLRB conducted a secret ballot election. Of the thirty-three eligible voters, seventeen cast ballots in favor of the union and fifteen voted against. The company filed three objections to conduct affecting the election results:

(1) During the period before the election an individual acting on behalf of petitioner intimidated, threatened and/or coerced an eligible voter. Such conduct thereby unfairly affected the results of the election.

(2) On the day of the election a Union representative engaged in last minute electioneering directed toward no less than two eligible voters in the relative vicinity of the polls shortly before the opening thereof. Such conduct unfairly affected the results of the election.

(3) During the twenty-four hour period before the holding of the election, a Union representative met on company time with eligible voters in violation of the Board's *Peerless Plywood* rule. [107 NLRB 427]

The Regional Director after an administrative investigation recommended that the second and third objections be overruled and that a hearing be held on the company's first objection. The Board adopted those recommendations. A hearing officer then conducted a hearing on the first objection, found it to be without merit, and recommended that it be overruled and that a certification representative be issued to the union. On April 3, 1972, the Board, with one member dissenting, overruled the objections to the hearing officer's report filed by the company and adopted his findings and recommendations and certified the union as the exclusive bargaining representative. 196 NLRB No. 6. The company refused to bargain with the union and thereafter the Board's General Counsel issued a complaint that the company had committed unfair labor practices in violation of Section 8(a)(5) and (1) of the National Labor Relations Act,

* Senior District Judge A. Sherman Christensen of the District of Utah is sitting by designation.

29 U.S.C. § 158(a)(5) and (1), by refusing to bargain. The company answered and raised the same objections as it had previously raised. The Board found an unlawful refusal to bargain and ordered the company to bargain with the union upon request and to post appropriate notices. 199 NLRB No. 35. This application for enforcement followed.

The company raises three issues: (1) the Board failed to consider relevant evidence dealing with the second and third objections and denied due process of law to the company by refusing to order a hearing on these objections; (2) the Board abused its discretion by holding that the threats and coercion referred to in the first objection did not warrant setting aside the election; and (3) the Board failed to consider the combined effect of the acts alleged in the three objections.

Because of our resolution of the second issue, it is unnecessary to reach the other issues. The company alleged that George Rodriguez, an employee, had threatened on a number of occasions prior to the election to harm other employees. The conclusions of the hearing officer which were adopted by the Board were: (1) that Rodriguez was not an agent of the union and his statements therefore, were not attributable to the union, and (2) that the threats did not create a general atmosphere of fear and reprisal rendering the free choice of representatives impossible.

Rodriguez had been employed by the company for over three years as a lineman and repairman. He is physically large, one of the largest men in the bargaining unit. He had a reputation for fighting, although the company did not know of any problems that he had with fellow employees.

Rodriguez initiated the contact with the union and asked the union organizer, Marvin Devries, to speak to the employees about the union. Devries and the union business manager, De Wayne Wruck, testified that Rodriguez did not hold any official position in the union and was not authorized to speak on its behalf. He was, however, one of three men selected by the union to be a "contact man." As "contact man" he received no benefits from the union but served on a volunteer basis. He acted as a liaison between the employees and the union in order to relay information. At the request of other employees, the union replaced Rodriguez as contact man shortly before the election. Rodriguez did ask the company for permission to speak on behalf of the union at one meeting of the employees in order to invite them to attend a later scheduled union meeting. But Devries and James Conway, the union lawyer, had informed the employees at one of the meetings that only they were authorized to speak on behalf of the union.

Based on Rodriguez' affidavit and the testimony of John Schafer, the company vice president, which he found to be truthful, the hearing officer found four incidents involving Rodriguez in threats to other employees.

The first incident occurred two days before the election at a company meeting of all the employees. At the meeting, Schafer overheard Rodriguez tell a group of four or five employees that if the union did not get in, and he found out who voted against the union, there would be some "smashed faces." The hearing officer concluded that the statement did not interfere with the election because the employees apparently reasoned that Rodriguez could not carry out his threat. In reaching that conclusion, the hearing officer relied on Schafer's failure to respond, on the lack of complaint from any employee, and on the inability of Rodriguez to carry out his threat due to the election being by secret ballot.

In the second incident, Rodriguez admitted that on the same day at a different location he told a group of at least three employees that "he would kick ass and take names if we [the union] don't win the election." Rodriguez stated that all the people that he spoke with were good friends and prounion although he was not certain who was present. Two

days after the election, an employee came to Schafer's office and told him he had overheard the statement. He asked to speak to Schafer in confidence about the matter. Schafer testified that the man was definitely afraid. The hearing officer discredited the incident concluding that Rodriguez' statement, made to good friends, was not sufficient to prevent or impair a free and unfettered choice of representatives.

The third incident occurred in early May. Another employee approached Schafer and told him in confidence that he was under a lot of pressure prior to the election to attend union meetings and that Rodriguez and an unidentified person told him that if he did not go, he would be in "big trouble." The employee told Schafer that he did not report this earlier since he did not think that there was anything the company could do.

The hearing officer found Rodriguez' latter two statements to be devoid of any threat to the employees. Since the company offered no evidence as to the context in which the statements were made, he found the statements to be ambiguous with a likely interpretation being that the employee would be sorry to lose the benefits of union representation.

■■ Both parties to this proceeding agree that the standard of review is whether the Board abused its discretion in finding that the company's objections did not warrant setting aside the election. Congress "entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946). Pursuant to that discretionary authority, the Board formulated a standard by which to judge the fairness of elections: "[W]hether the election was conducted under such circumstances and under such conditions as were conducive to the sort of free and untrammeled choice of representatives contemplated by the Act." Diamond

State Poultry Co., 107 NLRB 3, 6 (1953). We agree with the Fifth Circuit's explanation of that test stated in NLRB v. Zelrich Company, 344 F.2d 1011, 1015 (1965):

> For conduct to warrant setting aside an election, not only must that conduct be coercive, but it must be so related to the election as to have had a probable effect upon the employees' actions at the polls.

In applying the test for free elections, the Board has established a stricter standard of conduct for the union and the company than for third parties. In Orleans Manufacturing Company, 120 NLRB 630, 633–34 (1958), the Board set forth the differentiated standard and the policy behind it:

> While the Board will consider conduct not attributable to any of the parties in determining whether an election should be set aside, the Board accords less weight to such conduct than to conduct of the parties. The Board believes that the conduct of third persons tends to have less effect upon the voters than similar conduct attributable to the employer who has, or the union which seeks, control over the employees' working conditions. Furthermore, were the Board to give the same weight to conduct by third persons as to conduct attributable to the parties, the possibility of obtaining quick and conclusive election results would be substantially diminished. The employer and the union are deterred from election misconduct by the unfair labor practice provisions of the Act and by the trouble and expense which repeated elections impose upon them. The absence of similar deterrents against third persons who wish to forestall a conclusive election may make them more prone to engage in conduct calculated to prevent such a result.

The Board strenuously argues that Rodriguez' statements are not attributable to the union since he was not an agent. Counsel for the Board did, however, admit at oral argument that Rodri-

guez was a "conduit" of information from the employees to the union and from the union to the employees. Devries, the union organizer, testified that the union exercised authority over Rodriguez in his selection as a "contact man" and later by his replacement by someone else when the company employees asked for a change. Rodriguez, it must be remembered, initiated the union organizing by asking Devries to speak to the employees about the benefits of the union. He was one of the leaders if not the leader in bringing in the union.

■ Devries admitted to hearing of threats being made against employees opposed to the union but attributed them to rumors being started by the company. He asked at one meeting about the threats, but no employee admitted knowledge of the threats. Although Devries raised the subject, he never repudiated the alleged threats. The Board argues that a disavowal was unnecessary. But it was. If the union wanted to avoid having Rodriguez' statements attributed to it, it was required that Devries after learning of the threats disclaim any part in their making. It would be unreasonable for the union after learning of the threats to put the burden on the employees at the meeting to come forward and accuse Rodriguez of making threats before a disavowal on its part was required. This principle is nothing new; it was applied to an employer in Hamburg Shirt Corp., 156 NLRB 511, 523 (1965), when the company "did not completely disavow the threats [to close the plant] uttered by . . . [third parties] when the employees called them to [the company's] attention." *See also* Colson Corporation v. NLRB, 347 F.2d 128, 136–137 (8th Cir. 1965).

As mentioned before, the Board strenuously argues that Rodriguez was not an agent. The National Labor Relations Act, 29 U.S.C. § 152(13), provides:

In determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

■ When applying that definition to an employer, the courts have always liberally construed the principles of agency, NLRB v. Arkansas-Louisiana Gas Company, 333 F.2d 790, 795 (8th Cir. 1964). Justice Douglas' language in International Association of Machinists v. NLRB, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940), about agents for employers is equally apropos to unions:

The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of *respondeat superior*. We are dealing here not with private rights (Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738) nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. Thus where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates.

■ The Board poses the question: Was Rodriguez an agent? We believe the better formulation to be whether

Rodriguez' conduct is attributable to the union. We conclude that it was because of his close connection with the union and the union's failure to repudiate his threats.

The Board argues that Rodriguez' threats were merely "tough talk"; that Rodriguez was a "blustery individual"; and that there were no specific statements made to any particular persons, and that similar statements are part of many union organizing campaigns. We, of course, are not dealing with other organizing campaigns—only the one involved here. The election was as close as possible. If one employee because he feared physical harm voted for the union rather than against, the election result was tainted since, otherwise, the union would have lost the election. The Board has emphasized the conditional nature of Rodriguez' threats: If the union lost and if Rodriguez found out who voted against the union, then he would smash faces. The Board contends that the employees did not have to fear that their votes would be revealed since they knew that the election would be by secret ballot. Here was a relatively small group of employees who knew each other fairly well. Rodriguez knew certain employees to be prounion and stated so in his affidavit. It would be relatively easy in a group of that size to figure out who voted which way by knowing the tally. Granted that this is not a foolproof method, an employee may still have voted out of fear rather than free choice so as to avoid being suspected of being against the union and risking retaliation from Rodriguez.

In the above circumstances, we conclude that Rodriguez' threats were coercive and attributable to the union and had a probable effect upon the votes of the other employees in the representation election. The Board abused its discretion validating the election.

The application for enforcement is denied.