**CERTAIN–TEED PRODUCTS CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Intervenor.**

No. 76–2028.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1977.

Decided Sept. 29, 1977.

Victor Schachter, New York City, for petitioner.

Herbert L. Segal, Irwin H. Cutler, Jr., Louisville, Ky., for intervenor.

Elliott Moore, Deputy Associate Gen. Counsel, Corinna Metcalf and Madge F. Jefferson, N. L. R. B., Washington, D.C., for respondent.

Before TONE, BAUER and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This case is before the court on the petition by Certain-Teed Products Corporation (hereinafter referred to as the company) to review and set aside the order of the National Labor Relations Board (hereinafter referred to as the Board) issued on August 18, 1976, and reported at 225 NLRB No. 140. The board found that the company violated § 8(a)(5) and (1) of the National Labor Relations Act by refusing to bargain with International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (hereinafter referred to as the union) after a majority of the company's employees voted for the union in a Board election. The company contends on appeal that both the union's written offer to waive initiation fees and oral pre-election statements made by the union organizer and his agents were in violation of the rule in *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973).

The Board has filed a cross-application for enforcement of its order and the union was permitted by this Court to intervene in these proceedings.

For the following reasons, we find that the company's petition must be denied and that the Board's petition for enforcement should be granted.

1. Written waiver of initiation fees.

Prior to the NLRB election which was conducted May 30, 1974, August Kettler, the representative of the union responsible for organizational efforts, held approximately fifteen meetings with the company's employees. At these meetings, Kettler distributed literature to company employees entitled "What You Should Know—UAW." Kettler pointed out specific topics covered by the pamphlets and told the employees that the pamphlets would answer 95 percent of all questions about the union. On the subject of initiation fees, Kettler repeatedly read to the employees a portion of the pamphlet which stated:

Will I be required to pay an initiation fee?

No. In new plants being organized, the International Union usually does not charge an Initiation Fee until after giving employees a certain period of time to join the Union after a Labor Board election. Those who join during that period will not be required to pay any initiation fee.

In addition to this pamphlet, the union distributed a leaflet on May 21, 1974, which provided in part:

QUESTION: WILL I BE REQUIRED TO PAY AN INITIATION FEE?

Answer: No. In new plants being organized, the International Union usually does not charge an Initiation Fee until after giving employees a certain period of time to join the Union after a Labor Board Election. Those who join during that period WILL NOT be required to pay any initiation fee.

The company argues that the written offer to waive the initiation fee is improper under the standards set forth in *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973). The company contends that inherent in the statement that the union "usually" does not charge an initiation fee until after the expiration of a grace period was the implication that the union sometimes does not grant a post-election grace period and charges employees who have not signed a card before the election. According to the company, it was reasonable for employees to conclude that an initiation fee would be waived only if they signed a card prior to the NLRB election. The company also contends that since the language in the written material was ambiguous and subject to an interpretation contrary to *Savair*, a new election is warranted.

"In *Savair* the Supreme Court held that an offer to waive initiation fees conditioned on an employee's joining the union *before* the election was coercive and unjustly allowed a union to 'buy endorsements and paint a false portrait of employee support during its election campaign.' 414 U.S. at 277, 94 S.Ct. at 499." *Warner Press, Inc. v. NLRB*, 525 F.2d 190, 196 (7th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1410, 47 L.Ed.2d 348. For the following reasons, we find that the written material used by the union does not run afoul of *Savair*.

The union literature made clear that the only way for an employee to enjoy a waiver of initiation fees was by joining the union during the grace period after the NLRB election. An unconditional waiver of initiation fees available to all employees after the NLRB election is permissible under *Savair*. We find the company's argument based upon the use of the term "usually" to be unpersuasive. We agree with the Board and the union that the term "usually" merely describes the customary policy followed by the union. We cannot say that use of that term confused employees and resulted in employees feeling pressured to sign an authorization card or a union membership card prior to the election.

■ In addition, Kettler repeatedly explained to employees the difference between the green authorization card and the yellow union membership card which were available. Kettler told employees at union meetings that the only purpose for the green authorization cards was to secure a secret ballot election. Similarly, Kettler told employees that they would not have an opportunity to sign the yellow union membership cards until after the NLRB election.[1] The record demonstrates that yellow union membership cards were not handed out until after the NLRB election. Since the written union waiver made clear that initiation fees would have to be paid only if an individual did not join the union during the grace period after the NLRB election, and since there was no opportunity to join the union until after the election, we do not see how the written waiver placed pressure on employees to join the union prior to the election. In addition, since the difference between the green authorization cards and the yellow union membership cards was explained at union meetings, the written union waiver did not provide a basis for employees to believe that the initiation fee could be avoided if they signed a green authorization card prior to the election.

■ The company also contends that the Hearing Officer failed to give meaningful consideration to the question of the validity of the written offer. According to the company, the passing reference to the written offer to waive initiation fees found in footnote 7 of the Hearing Officer's July 22, 1975, Report and Recommendations failed to mention the term "usually" and thereby mischaracterized the terms of the written waiver. The company asserts that this indicates that the Hearing Officer failed to rule on the precise question raised. Since the Board's Supplemental Decision of October 17, 1975, adopted the findings of the Hearing Officer as to the propriety of the written waiver, the company asserts that, at a minimum, due process requires that this matter be remanded.

We find the company's argument to be without merit. The company made this same argument before the Board and lost. The Board stated in its August 18, 1976, order, " . . . the specific contention of the illegality of certain written materials . . . was disposed of in the representation proceeding." We cannot conclude by reading footnote 7 of the Hearing Officer's July 22, 1975, Report and Recommendations that the issue raised by the company was not considered. As we recently stated:

It is well established that in a refusal-to-bargain unfair labor practice proceeding, there need be no evidentiary hearing to establish facts on which a certification is challenged if the company's objections have been adequately litigated and determined in the prior representation proceeding. [*NLRB v. Southern Health Corp.*, 514 F.2d 1121, 1125–26 (7th Cir. 1975).]

*Warner Press, Inc.*, 525 F.2d at 197.

2. Oral statements by Kettler concerning waiver of initiation fees.

The Hearing Officer discredited the testimony of three employees—Billy Ray Jones,

---

1. In addition to Kettler's explanation, Employer's Exhibit 3(b) was a written document distributed to employees which contained an example of an authorization card and a union membership card. In the margin along side the sample authorization card, Employer's Exhibit 3(b) stated:

THIS IS NOT A U.A.W. MEMBERSHIP CARD
The signing of this card will help you and your fellow employees to get a *secret ballot NLRB election.*
Similarly, adjacent to the sample union membership card, the following was stated:
THIS IS A U.A.W. MEMBERSHIP CARD

Many of you have been misled into believing if you sign the "Green" card you will automatically become a member of UAW. *The truth is you will not*!!!
You will not be given the opportunity of signing the membership card at the left, until after a majority of you in your plant have voted by a *secret ballot election,* conducted by the Federal Agency (NLRB), to have UAW as *your union.*
There will be a *special meeting* for all Certain-Teed employees at the Quality Court Inn on Wednesday, February 27, 1974. Plan to attend!!! Hear the *Facts*!!!

Jerry Lawson and Margaret Bray—whose testimony was in some respects in conflict with Kettler's testimony. The Board affirmed the Hearing Officer's findings of credibility. The company argues that these findings are against the weight of the evidence. For the following reasons, we disagree.

In his testimony before the Hearing Officer, Jones described the following conversation with Kettler which occurred prior to a union meeting:

So, I went to a meeting and I talked to Mr. Kettler—

\*　\*　\*　\*　\*　\*

What I wanted to find out mostly was about insurance, which I discussed with him, and we got to discussing about the signing of cards, and the way he explained it, if you signed the card you didn't have to pay the initiation fee, and he said if you didn't sign the card, somewhere later on down the road you would have to pay an initiation fee. (Tr. 179).

Similarly, the company relies on Lawson's statement that Kettler "said that people that sign the union cards would have to pay no initiation fee." (Tr. 179).

The Hearing Officer ruled as follows in discrediting the testimony of Jones and Lawson:

In general, the testimony of witnesses Jones and Lawson is consistent with that of Kettler in regard to his statements concerning the waiver of initiation fees at union meetings. Wherever their testimony differs with that of Kettler, I credit Kettler. I base this finding on my observation of the demeanor of the witnesses and in particular the fact that both Jones and Lawson had faulty recollection as to the sequence of events and the specifics of the union meetings. On the other hand, Kettler impressed me as a forthright and honest witness who possessed a much more detailed recollection of the events. It is also noted that Lawson's testimony that Kettler told employees that if they signed union cards before the election they would not have to pay initiation fees was elicited only after the witness' recollection had been refreshed and then only by the use of leading questions. The faulty recollection, and at times confused testimony, of Jones and Lawson may be attributed to the fact that Petitioner utilized two different cards during the course of the events in the instant case. Furthermore, there were two elections of significance for Lawson and Jones. The first election being of course the NLRB election which was held on April 1. The second election involved the election of local union officers at which both Lawson and Jones sought a position.

▮ The decision of the Hearing Officer is entitled to considerable weight where the issue turns on the credibility of witnesses who he alone saw. *Wm. H. Block Company v. NLRB,* 367 F.2d 38 (7th Cir. 1966). Decisions of the Board will not be upset where the Board accepts a finding ". . . of an Examiner which is grounded upon (a) his disbelief in an orally testifying witness' testimony because of the witness' demeanor or (b) the Examiner's evaluation of oral testimony as reliable, unless on its face it is hopelessly incredible." *Amalgamated Local Union 355 v. NLRB,* 481 F.2d 996, 1005 (2d Cir. 1973). After reviewing the transcript of testimony of Jones and Lawson, we cannot accept the company's argument that the evidence supporting the findings of the Hearing Officer is incredible.

For example, a review of Jones' testimony supports the Hearing Officer's conclusion that Jones' testimony was confused, imprecise, and contradictory. Jones first stated that Kettler's comment occurred two or three weeks prior to the election and that he (Jones) had signed a yellow card that day. Evidence was introduced, however, to show that Jones signed the yellow union membership card on June 23, 1974, a date after the NLRB election. In addition, although he recalled at one point that there may have been another card, Jones later stated that he did not know if there was another card, what its color was, or what was on it. Jones also initially stated that the election of union officers was discussed

at this meeting but the nomination of candidates for union offices was not held until a later date. Jones stated at another point, however, that nominations were held on the same night that he signed his card.

Similarly, Lawson's testimony was also confused and imprecise. As we have indicated, the company relied on Lawson's statement that Kettler "said that people that sign the union cards would have to pay no initiation fee." (Tr. 179). The meaning of this portion of Lawson's testimony becomes unclear, however, when placed in the context of the following additional statements by Lawson which described Kettler's alleged comments:[2]

Q. What was said at the meetings you attended, what did Mr. Kettler say about the fees?

A. Well, there was said something about the shut-off date was going to be for employees that there wouldn't be no initiation fee charged, that people that was hired after that date would pay an initiation fee. (Tr. 174).

\* \* \* \* \* \*

Q. Did Mr. Kettler say that would not have to be paid under any circumstances?

A. I think I've done said that there was going to be a cut-off date set and people hired after that, that they would be entitled to pay, anyway, initiation fee.

Q. Was anything said—

A. (Interposing): People that didn't vote in the election.

Q. The people that didn't vote in the election would have to pay the initiation fee?

A. I may not be exactly brief on it, but there was a cut-off date set that people that was hired after a set date would not be allowed to vote in union affairs. (Tr. 175–76).

\* \* \* \* \* \*

I think that I have pretty well come around to the point to the matter of fact that it was discussed that people that signed the cards wouldn't have to pay no initiation fee to join the union. I think I've stated that. (Tr. 178).

In addition, Lawson's testimony reflects total confusion about the difference between the union membership card and the recognition card. Thus, it is unclear whether the union card referred to in the quote relied upon by the company was the green recognition card or the yellow union membership card which was not available until after the NLRB election. In addition, although Lawson stated that he was involved in encouraging employees to sign the union cards, it is unclear which card he was dealing with.

■ Similarly, the company asserts that the Hearing Officer incorrectly discredited Margaret Bray's version of an alleged oral statement by Kettler concerning waiver of initiation fees. The company relies on the following testimony by Bray:

A. I don't remember exactly how it was brought up, but I do remember that the fee was talked about and at that time it was mentioned as ten or 15 dollars that we would have to pay if we didn't sign a card before the election.

Q. Who made that statement?

A. Mr. Kettler. (Tr. 124).

We note, however, that Bray also testified about a handbill which someone allegedly handed to her as she left the plant prior to the NLRB election. According to Bray, the document provided as follows:

**2.** We believe that there is support in the record for the Hearing Officer's conclusion that the testimony of Jones and Lawson was consistent with that of Kettler on the question of waiver of initiation fees. Although both Jones and Lawson indicated that Kettler's statements were made prior to the NLRB election, their testimony was confused on that point. Thus, Kettler's version of his remarks which he stated were made at a meeting on June 23, 1974, a date after the NLRB election, and which are similar in content to Jones' and Lawson's version casts further doubt on the accuracy of their testimony. Kettler stated:

I also told them that the signing of this card is a membership card in the UAW and those people who signed this card prior to a cut-off date that would be established after the plant was certified, and that cut-off date would be established by their local union and its membership, and anyone who signed this card prior to that date would be exonerated from paying an initiation fee in the UAW. (Tr. 288).

It was speaking of, if you paid—excuse me—if you signed a card before the election, that you would be the same as receiving $50.00 because you would not have to pay if you would sign before the election date. (Tr. 134).

Bray stated that she threw out her copy of the leaflet and the company did not produce a copy of the handbill at the hearing. In addition, Bray was unable to identify who handed the handbill to her and there was no evidence that other employees received this document. Kettler specifically denied that a handbill with this content was ever handed out to employees. Bray also stated that she was known for her anti-union bias, that she did not sign an authorization card, and that the meeting where Kettler allegedly made the statement concerning waiver of initiation fees was the only union meeting that she attended. The Hearing Officer rejected Bray's testimony and ruled as follows:

> The testimony of witness Bray concerning a union meeting she allegedly attended two weeks or a week before the Board election is in complete variance with that of Kettler. Bray's entire testimony is laced with a complete lack of specificity as to be of probative value. In particular, Bray's testimony concerning the alleged handbill she received as she was leaving the plant is completely unbelievable. Bray stated that she did not save a copy of the handbill, she could not recall who gave it to her, whether the individual was a male or female nor did she know if any other employee received a copy of the handbill. No other witness testified to the existence of such a handbill. Kettler testified that during the course of the campaign, he, on a number of occasions, distributed leaflets and handbills at the Employer's plant. However, Kettler categorically denied that he ever distributed a handbill as described by Bray. Furthermore, no party at the hearing offered into evidence any document which even remotely resembled that described by Bray. In sum, I discredit Bray's testimony as to the alleged remarks made by Kettler at the union meeting and as to the distribution of this handbill.

Under these circumstances, we cannot say that the Hearing Officer's conclusion was incorrect.

██ The company also contends that the Hearing Officer's finding that Kettler was an honest and forthright witness was erroneous. The company first asserts that Kettler was not truthful when he testified that after the petition for election was filed with the NLRB, the emphasis switched from encouraging employees to sign authorization cards to convincing employees to vote for the union in the NLRB election. The company in support of this contention introduced evidence which indicated that union policy encourages organizers to obtain authorization cards from a majority of employees. Kettler, however, testified that he was unfamiliar with this policy. In addition, Kettler's testimony was supported by evidence which showed that seventy employees signed authorization cards before the petition for election was filed while only nine employees signed authorization cards after the petition was filed.

██ The company further argues that Kettler was not truthful in his testimony concerning the submission of organizational reports to union superiors. According to the company, Kettler attempted to evade disclosure of these reports since the reports contained information which contradicted his testimony that the union stopped encouraging employees to sign authorization cards after the petition for election was submitted to the NLRB. Although he first testified that reports were submitted infrequently to union superiors, Kettler after checking his records stated that a report was submitted once every two weeks. The report form filled out by Kettler required a running tally of authorization cards to be maintained. The information submitted to the union superiors, however, supports Kettler's testimony since only nine employees signed the authorization cards after the petition for election was filed.

██ Finally, the company attacks Kettler's credibility because he refused to ac-

knowledge the existence of an in-plant organizing committee despite reference to such a committee in a letter sent by Kettler to the company. In addition, the company contends that Kettler's credibility is undermined by his refusal to identify who was on the committee. We find that this argument is also without merit. Kettler described the organizing committee as follows:

Q. Now, Mr. Kettler, there was an organizing committee of Certain-Teed employees who assisted you in your efforts at the Certain-Teed plant, wasn't there?

A. Not as such.

Q. Wasn't there, Mr. Kettler, a group of people whom you referred to as your organizing committee, whom you relied upon in order to assist your efforts to sign up the employees at the Corbin plant?

A. Only those people who came to the membership meeting—I mean the organizational meetings. They worked to get cards signed in the plant and so forth and so on.

Q. Mr. Kettler, is it your testimony that everybody that came to your meetings was a member of the organizing committee?

A. Absolutely, if they so chose to be.

Q. Well, what I'm asking you is which people chose to be.

A. Those people who got cards signed, I guess.

Q. Is it your testimony that there was, in fact, an organizing committee or that there was no organizing committee?

A. There was no organizing committee, as such.

Q. What do you mean, "as such"?

A. Well, during the campaign I had numerous buttons and stickers and what-have-you, which was put on a table in the meeting room. Anyone who came to my meetings had access to those buttons. Some of those buttons had "Organizing Committee" on them. I don't know who took those buttons and who didn't. They could take any of the materials that was there.

Q. So it's your testimony now that you don't know who was actually on your organizing committee, is that correct?

A. No, sir.

Q. Didn't you, in fact, have members of an organizing committee, people you called members?

A. No, sir. (Tr. 78–79).

Similarly, Kettler gave the following explanation of his reference to an organizing committee in the letter sent by him to the company:

Q. What was the reason, then, that you sent the letter to the company asking them to be particularly aware that there was an in-plant organizing committee and not to take any reprisals against those employees?

A. Well, just exactly what the letter says, to protect the people.

Q. So there is some concern, isn't there, for the people that are on the organizing committee, isn't that so?

A. There's concern for any people who wear any kind of union paraphernalia.

Q. But you were particularly concerned in that letter about protecting the people that were in, as you put it, the in-plant organizing committee, isn't that true?

A. I guess that's true. (Tr. 411–12).

Thus, Kettler did not refuse to acknowledge the existence of an in-plant organizing committee. On the contrary, he stated that there was no formal committee with a set membership. According to Kettler, any employee who wished to become involved in the organizational effort was considered a member of the committee. In light of this loose definition of membership, we do not find incredible Kettler's inability to identify employee members.

3. Oral statements by other employees.

The company argues that Barbara Lewis, Harold Lawson and Clyde Merida made oral statements which led employees to believe that waiver of the initiation fee was conditioned on signing a union card prior to the NLRB election. The company asserts that the statements made by H. Lawson, Merida

and Lewis should be attributed to the union since they were members of the in-plant organizing committee. The company further contends that enforcement of the Board's order should be denied and that the election results should be set aside.

The company relies on the testimony of Agnes Witt and Frances Turner as evidence of Barbara Lewis' alleged statements. According to Witt, Lewis stated that if employees did not sign a union card prior to the election, "we would have to pay a fee later." (Tr. 164). Similarly, according to Frances Turner, Barbara Lewis asked Wilma Smith to sign a card and stated "that if she signed a union card now, she wouldn't have to pay a fee later on." (Tr. 150). The company relies on the testimony of Margaret Bray to prove the alleged statements of Clyde Merida and Harold Lawson. Margaret Bray testified that Clyde Merida and Harold Lawson asked her to sign a union card and stated that "if we would sign one of these cards, that it would be the same as receiving $50.00 because we would save it if we went ahead and signed it before the election." (Tr. 123).

The company places principal reliance on *NLRB v. Urban Telephone Corporation*, 499 F.2d 239 (7th Cir. 1974). In *Urban Telephone Corporation*, an employee, Rodriguez, initiated the contact with the union. Rodriguez did not hold an official position with the union and was not authorized to speak on behalf of the union. Rodriguez was, however, one of three contact men selected by the union whose function was to relay information between the union and employees.[3] Rodriguez received no monetary benefit from the union and acted on a volunteer basis. Although the union organizer heard that Rodriguez on a number of occasions threatened anti-union employees, the union organizer never repudiated the threats. This court first cited 29 U.S.C. § 152(13) of the National Labor Relations Act which provides:

In determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

This court also recognized that principles of agency should be liberally construed in this context. The court stated that rather than ask whether Rodriguez was an agent of the union, the better formulation was whether Rodriguez' conduct was attributable to the union. The court concluded the union was responsible for Rodriguez' conduct "because of his close connection with the union and the union's failure to repudiate his threats." *Urban Telephone*, 499 F.2d at 244.

In the present case, on the other hand, there was no close connection between the union and Lewis, H. Lawson and Merida.[4] The only evidence as to the relationship of Lewis, H. Lawson and Merida to the union is found in Kettler's testimony. Kettler stated that Lewis' involvement with the

---

**3.** The court stated that counsel for the Board admitted at oral argument "that Rodriguez was a 'conduit' of information from the employees to the union and from the union to the employees." *Urban Telephone Corporation*, 499 F.2d at 242–43. In addition, the court stated:

Devries, the union organizer, testified that the union exercised authority over Rodriguez in his selection as a "contact man" and later by his replacement by someone else when the company employees asked for a change. Rodriguez, it must be remembered, initiated the union organizing by asking Devries to speak to the employees about the benefits of the union. He was one of the leaders if not the leader in bringing in the union. *Urban Telephone Corporation*, 499 F.2d at 243.

**4.** The Hearing Officer ruled as follows in concluding that Merida, Lewis and Lawson were not agents of the union:

The uncontroverted evidence is prior to July 1, Merida, H. Lawson and Lewis held no position with the Petitioner, received no gifts or monetary remuneration from Petitioner, or served in any capacity or function at union gatherings. Furthermore, Kettler testified that these individuals had no authority to speak or act for Petitioner. An examination of the exhibits submitted indicates that Merida attended many union meetings as did other employees. However, employee H. Lawson's name did not appear on any list, and Lewis' name appeared only on the May 22 and 29 lists. This supports Kettler's testimony that Lewis did not become active in the union's organizational campaign until late in

union prior to the NLRB election consisted of attending several meetings, handing out leaflets, and turning in union membership cards. According to Kettler, Lewis held no position with the union, performed no function at union meetings and was not authorized to speak or act on behalf of the union. Kettler stated that Lewis was subsequently nominated for the position of vice-president of the union but lost. Similarly, Kettler testified that neither Merida nor H. Lawson held any position with the union, received any pay from the union, or possessed authority to speak or act on behalf of the union. Merida was elected president of the union subsequent to the NLRB election. Furthermore, the evidence did not show that Lewis, Merida and H. Lawson were wearing in-plant organizing committee buttons either at the time of these conversations or at any other time.

Although Lewis, Merida and H. Lawson can be considered members of the in-plant organizing committee by virtue of involvement in leafletting or encouraging employees to sign cards, that association does not constitute the same type of close relationship as existed in *Urban Telephone Corporation*. On the contrary, Kettler testified that there were no specific members of the

in-plant organizing committee and that anyone who attended a meeting could be a member. (Tr. 79, 81). Union organizational literature and buttons were placed on a table so that all employees could take whatever they wished. (Tr. 29). In addition, Kettler stated that he did not ask specific employees to solicit cards or leaflet. All employees were invited to get involved. (Tr. 81, 283).

In addition, the present case is also unlike *Urban Telephone Corporation* since there was no evidence of knowledge on the part of the union without union repudiation of improper conduct. On the contrary, the record shows that Kettler repeatedly explained at union meetings that the initiation fee waiver would remain available after the NLRB election. That information was also conveyed to employees through written union literature. The difference between the green authorization card and the yellow union membership card was also repeatedly explained to the employees.[5]

Thus, under the particular circumstances of this case, we find that the oral statements of Lewis, Merida and H. Lawson should not be attributed to the union. Since the misconduct of third par-

---

the campaign, and that she never solicited green authorization cards. The fact that Lewis witnessed many signatures on yellow membership cards is non-determinative as all were signed on or after June 23. Both Merida and Lewis were nominated at the June 23, union meeting for officers in the local union and Merida was subsequently elected president after a run-off election, however, this occurred after the Board election. Merida and Lewis as well as other employees were named as assisting Kettler in handbilling the Employer's plant, however, H. Lawson was not so named. In view of the foregoing, I find that Merida, Lewis and H. Lawson were not agents of the Petitioner during the time of the alleged conversations. Consequently, any remark attributed to these individuals cannot be attributed to the Petitioner.

5. We also find distinguishable *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239 (4th Cir. 1976), a case not relied upon or cited by the company. In *Georgetown Dress Corp.*, an employee in-plant organizing committee, which provided the only in-plant union contact with employees, conducted the entire organizational effort. Although the professional union organizer instructed employee committee members

not to threaten or intimidate anyone, the union did not disavow the misdeeds committed by members of the committee. The court ruled:

Concededly, there is no evidence to show that the union authorized the acts of misconduct, and in that sense the acts are not attributable to the union under the principle of express authority; but we think that the union is chargeable with the misdeeds under the principle of apparent authority. The committee members in the eyes of other employees were the representatives of the union on the scene and the union authorized them to occupy that position. While they may have exceeded their authority and, indeed, acted contrary to their express instructions, their acts were apparently within the scope of their authority, neither their misdeeds nor their authority were repudiated by the union, and their acts did not so far exceed their authority as to make obvious to the persons who were coerced and intimidated that the union would not ratify what was done. 537 F.2d at 1244.

In the present case, on the other hand, Kettler who was a full time professional union organizer was active at the plant. In addition,

ties is given less weight in assessing whether an election need be set aside, see *Urban Telephone Corporation*, 499 F.2d at 242, we conclude that the oral statements of Lewis, Merida and H. Lawson did not adversely affect the election.

### CONCLUSION

For the foregoing reasons, the company's petition to set aside the order of the Board is hereby denied. The Board's cross-application for enforcement is hereby granted.

there was no evidence that the three employees alleged to have made misstatements were regarded by other employees as members of an organizing committee or representatives of the union. Finally, whereas the union in *Georgetown Dress Corp.* knew of but failed to repudiate the misconduct, there was no evidence in the case now before this court that the union through Kettler knew of the improper statements. In addition, the union was continually disseminating accurate information concerning the waiver of initiation fees.

We also find unpersuasive *NLRB v. Johnson and Hardin Company*, 554 F.2d 275 (6th Cir. 1977), a case submitted after oral argument to this court by the company pursuant to Circuit Rule 11. In a *per curiam* opinion denying enforcement of the Board's bargaining order, the court only stated that there was no dispute concerning the propriety of a ruling by the Hearing Officer which found that employees who were soliciting and collecting a $10 amount were agents of the union for the purpose of carrying out their designated objectives. The court did not express a view as to the propriety of the Hearing Officer's decision. In addition, an examination of the Hearing Officer's Report in that case indicates that employees engaged in solicitation on behalf of the union were members of a formal twenty-nine member organizing committee. A list setting forth the names of members of the committee was sent to the employer approximately eight months prior to the election. In addition, one of the employees alleged to have made an improper statement was chairman of the organizing committee.